# YATES ET AL. *v.* UNITED STATES.

No. 6.   Argued October 8–9, 1956.—Decided June 17, 1957.

*Ben Margolis* argued the cause for petitioners in No. 6. With him on the brief were *Norman Leonard, Alexander H. Schullman, A. L. Wirin* and *Leo Branton, Jr.*

*Robert W. Kenny* argued the cause for petitioner in No. 7. With him on the brief was *Benjamin Dreyfus.*

*Augustin Donovan* argued the cause and filed a brief for petitioners in No. 8.

*Philip R. Monahan* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Tompkins* and *Harold D. Koffsky.*

Briefs of *amici curiae* urging reversal were filed by *David I. Shapiro, Osmond K. Fraenkel* and *Fred Okrand,* for the American Civil Liberties Union in No. 6, and *Thomas D. McBride,* for Kuzma et al., and *Telford Taylor,* for Hall, in Nos. 6, 7 and 8.

MR. JUSTICE HARLAN delivered the opinion of the Court.

We brought these cases here to consider certain questions arising under the Smith Act which have not heretofore been passed upon by this Court, and otherwise to review the convictions of these petitioners for conspiracy to violate that Act. Among other things, the convictions are claimed to rest upon an application of the Smith Act which is hostile to the principles upon which its constitutionality was upheld in *Dennis* v. *United States,* 341 U. S. 494.

These 14 petitioners stand convicted, after a jury trial in the United States District Court for the Southern District of California, upon a single count indictment charging them with conspiring (1) to advocate and teach the duty and necessity of overthrowing the Government of the United States by force and violence, and (2) to organize, as the Communist Party of the United States, a society of persons who so advocate and teach, all with the intent of causing the overthrow of the Government by force and violence as speedily as circumstances would permit. Act of June 28, 1940, § 2 (a)(1) and (3), 54

Stat. 670, 671, 18 U. S. C. §§ 371, 2385.[1]  The conspiracy is alleged to have originated in 1940 and continued down to the date of the indictment in 1951.  The indictment charged that in carrying out the conspiracy the defend-

---

[1] The Smith Act, as enacted in 1940, provided in pertinent part as follows:

"Sec. 2. (a) It shall be unlawful for any person—

"(1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence . . . ;

"(2) with the intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence;

"(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof.

.        .        .        .        .

"Sec. 3. It shall be unlawful for any person to attempt to commit, or to conspire to commit, any of the acts prohibited by the provisions of this title.

.        .        .        .        .

"Sec. 5. (a) Any person who violates any of the provisions of this title shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than ten years, or both."

Effective September 1, 1948, the Smith Act was repealed, and substantially re-enacted as 18 U. S. C. § 2385, as part of the 1948 recodification.  62 Stat. 808.  Section 2385 provided in pertinent part as follows:

"Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States . . . by force or violence . . . ; or

"Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advo-

ants and their co-conspirators would (a) become members and officers of the Communist Party, with knowledge of its unlawful purposes, and assume leadership in carrying out its policies and activities; (b) cause to be organized units of the Party in California and elsewhere; (c) write and publish, in the "Daily Worker" and other Party organs, articles on the proscribed advocacy and teaching; (d) conduct schools for the indoctrination of Party members in such advocacy and teaching, and (e) recruit new Party members, particularly from among persons employed in the key industries of the nation. Twenty-three overt acts in furtherance of the conspiracy were alleged.

Upon conviction each of the petitioners was sentenced to five years' imprisonment and a fine of $10,000. The

cating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence . . . ; or

"Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both . . . ."

For convenience the original Smith Act and § 2385 will both be referred to in this opinion as "the Smith Act."

It will be noted that the recodification did not carry into § 2385 the conspiracy section of the Smith Act (§ 3). The latter provision, however, was in substance restored to § 2385 on July 24, 1956, to apply to offenses committed on or after that date. 70 Stat. 623.

The conspiracy charged in this case was laid under § 3 of the Smith Act for the period 1940 to September 1, 1948, and for the period thereafter, down to the filing of the indictment in 1951, under the general conspiracy statute, 18 U. S. C. § 371, providing in pertinent part as follows:

"If two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Court of Appeals affirmed. 225 F. 2d 146. We granted certiorari for the reasons already indicated. 350 U. S. 860.

In the view we take of this case, it is necessary for us to consider only the following of petitioners' contentions: (1) that the term "organize" as used in the Smith Act was erroneously construed by the two lower courts; (2) that the trial court's instructions to the jury erroneously excluded from the case the issue of "incitement to action"; (3) that the evidence was so insufficient as to require this Court to direct the acquittal of these petitioners; and (4) that petitioner Schneiderman's conviction was precluded by this Court's judgment in *Schneiderman* v. *United States,* 320 U. S. 118, under the doctrine of collateral estoppel.[2] For reasons given hereafter, we conclude that these convictions must be reversed and the case remanded to the District Court with instructions to enter judgments of acquittal as to certain of the petitioners, and to grant a new trial as to the rest.

## I. *The Term "Organize."*

One object of the conspiracy charged was to violate the third paragraph of 18 U. S. C. § 2385, which provides:

> "Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any [government in the United States] by force or violence . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both . . . ."[3]

---

[2] We find it unnecessary to consider the petitioners' contention with respect to the District Court's alleged failure to apply the "clear and present danger" rule, as well as the contention that their motions for a new trial and a continuance were erroneously denied.

[3] See note 1, *supra,* at p. 302.

Petitioners claim that "organize" means to "establish," "found," or "bring into existence," and that in this sense the Communist Party[4] was organized by 1945 at the latest.[5] On this basis petitioners contend that this part of the indictment, returned in 1951, was barred by the three-year statute of limitations.[6] The Government, on the other hand, says that "organize" connotes a continuing process which goes on throughout the life of an organization, and that, in the words of the trial court's instructions to the jury, the term includes such things as "the recruiting of new members and the forming of new units, and the regrouping or expansion of existing clubs, classes and other units of any society, party, group or other organization." The two courts below accepted the Government's position. We think, however, that petitioners' position must prevail, upon principles stated by Chief Justice Marshall more than a century ago in *United States* v. *Wiltberger*, 5 Wheat. 76, 95–96, as follows:

"The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

---

[4] Except where otherwise indicated, throughout this opinion "Communist Party" refers to the present Communist Party of the United States.

[5] It is not disputed that the Communist Party, as referred to in the indictment, came into being no later than July 1945, when the Communist Political Association was disbanded and reconstituted as the Communist Party of the United States. The original Party was founded in this country in 1919.

[6] 62 Stat. 828, 18 U. S. C. § 3282.

"It is said, that notwithstanding this rule, the intention of the law maker must govern in the construction of penal, as well as other statutes. This is true. But this is not a new independent rule which subverts the old. It is a modification of the ancient maxim, and amounts to this, that though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorise us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule for other cases."

The statute does not define what is meant by "organize." Dictionary definitions are of little help, for, as those offered us sufficiently show, the term is susceptible

of both meanings attributed to it by the parties here.[7] The fact that the Communist Party comprises various components and activities, in relation to which some of the petitioners bore the title of "Organizer," does not advance us towards a solution of the problem. The charge here is that petitioners conspired to organize the Communist Party, and, unless "organize" embraces the continuing concept contended for by the Government, the establishing of new units within the Party and similar activities, following the Party's initial formation in 1945, have no independent significance or vitality so far as the "organizing" charge is involved. Nor are we here concerned with the quality of petitioners' activities as such, that is, whether particular activities may properly be categorized as "organizational." Rather, the issue is whether the term "organize" as used in this statute is limited by temporal concepts. Stated most simply, the problem is to choose between two possible answers to the question: when was the Communist Party "organized"? Petitioners contend that the only natural answer to the question is the formation date—in this case, 1945. The Government would have us answer the question by saying that the Party today is still not completely "organ-

---

[7] Both petitioners and the Government cite the following definitions of "organize" from Webster's New International Dictionary (2d ed.): "1. To furnish with organs; to give an organic structure to. . . . 2. To arrange or constitute in interdependent parts, each having a special function, act, office, or relation with respect to the whole; to systematize; to get into working order; as, to *organize* an army; to *organize* recruits." The Government also gives us the following from Funk & Wagnall's New Standard Dictionary (1947): "1. To bring into systematic connection and cooperation as parts of a whole, or to bring the various parts of into effective correlation and cooperation; as, to *organize* the peasants into an army." And petitioners cite Black's Law Dictionary, as follows: "To establish or furnish with organs; to systematize; to put into working order; to arrange in order for the normal exercise of its appropriate functions."

ized"; that "organizing" is a continuing process that does not end until the entity is dissolved.

The legislative history of the Smith Act is no more revealing as to what Congress meant by "organize" than is the statute itself. The Government urges that "organize" should be given a broad meaning since acceptance of the term in its narrow sense would require attributing to Congress the intent that this provision of the statute should not apply to the Communist Party as it then existed. The argument is that since the Communist Party as it then existed had been born in 1919 and the Smith Act was not passed until 1940, the use of "organize" in its narrow sense would have meant that these provisions of the statute would never have reached the act of organizing the Communist Party, except for the fortuitous rebirth of the Party in 1945—an occurrence which, of course, could not have been foreseen in 1940. This, says the Government, could hardly have been the congressional purpose since the Smith Act as a whole was particularly aimed at the Communist Party, and its "organizing" provisions were especially directed at the leaders of the movement.

We find this argument unpersuasive. While the legislative history of the Smith Act does show that concern about communism was a strong factor leading to this legislation, it also reveals that the statute, which was patterned on state anti-sedition laws directed not against Communists but against anarchists and syndicalists, was aimed equally at all groups falling within its scope.[8]

[8] Representative John W. McCormack, one of the leading proponents of the Smith Act, stated before the Subcommittee of the Committee on the Judiciary, House of Representatives: "And by the way, this bill is not alone aimed at Communists; this bill is aimed at anyone who advocates the overthrow of Government by violence and force." Hearing before Subcommittee No. 2 of the House Committee on the Judiciary on H. R. 4313 and H. R. 6427, 74th Cong., 1st Sess., May 22, 1935, Serial 5, p. 3.

More important, there is no evidence whatever to support the thesis that the *organizing* provision of the statute was written with particular reference to the Communist Party. Indeed, the congressional hearings indicate that it was the "advocating and teaching" provision of the Act, rather than the "organizing" provision, which was especially thought to reach Communist activities.[9]

Nor do there appear to be any other reasons for ascribing to "organize" the Government's broad interpretation. While it is understandable that Congress should have wished to supplement the general provisions of the Smith Act by a special provision directed at the activities of those responsible for creating a new organization of the proscribed type, such as was the situation involved in the *Dennis* case, we find nothing which suggests that the "organizing" provision was intended to reach beyond this, that is, to embrace the activities of those concerned with carrying on the affairs of an already existing organization. Such activities were already amply covered by other provisions of the Act, such as the "membership" clause,[10] and the basic prohibition of "advocacy" in conjunction with the conspiracy provision, and there is thus no need to stretch the "organizing" provision to fill any gaps in the statute. Moreover, it is difficult to find any considerations, comparable to those relating to persons responsible for creating a new organization, which would have led the Congress to single out for special treatment those persons occupying so-called organizational positions in an existing organization, especially when this same section of the statute proscribes membership in such an organization without drawing any distinction between those holding executive office and others.

---

[9] *Id., passim.*

[10] The "organizing" section, *supra,* n. 1, also makes it an offense "to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof."

On the other hand, we also find unpersuasive petitioners' argument as to the intent of Congress. In support of the narrower meaning of "organize," they argue that the Smith Act was patterned after the California Criminal Syndicalism Act;[11] that the California courts have consistently taken "organize" in that Act in its narrow sense;[12] and that under such cases as *Willis* v. *Eastern Trust & Banking Co.*, 169 U. S. 295, 304, 309, and *Joines* v. *Patterson*, 274 U. S. 544, 549, it should be presumed that Congress in adopting the wording of the California Act intended "organize" to have the same meaning as that given it by the California courts. As the hearings on the Smith Act show, however, its particular prototype was the New York Criminal Anarchy Act,[13] not the California statute, and the "organizing" provisions of the New York Act have never been construed by any court. Moreover, to the extent that the language of the California statute, which itself was patterned on the earlier New York legislation, might be significant, we think that little weight can be given to these California decisions. The "general rule that adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretations of the wording . . . is a presumption of legislative intention . . . which varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted and the presence or lack of other indicia of intention." *Carolene Products Co.* v. *United States,* 323

---

[11] Cal. Stat. 1919, c. 188, West's Ann. Cal. Codes, Penal Code, § 11401.

[12] See *People* v. *Thurman,* 62 Cal. App. 147, 216 P. 394; *People* v. *Thornton,* 63 Cal. App. 724, 219 P. 1020; *People* v. *Ware,* 67 Cal. App. 81, 226 P. 956.

[13] N. Y. Laws 1902, c. 371, McKinney's N. Y. Laws, Penal Law, § 161.

U. S. 18, 26. Here, the three California cases relied on by petitioners were all decisions of lower courts, and, in the absence of anything in the legislative history indicating that they were called to its attention, we should not assume that Congress was aware of them.

We are thus left to determine for ourselves the meaning of this provision of the Smith Act, without any revealing guides as to the intent of Congress. In these circumstances we should follow the familiar rule that criminal statutes are to be strictly construed and give to "organize" its narrow meaning, that is, that the word refers only to acts entering into the creation of a new organization, and not to acts thereafter performed in carrying on its activities, even though such acts may loosely be termed "organizational." See *United States* v. *Wiltberger, supra; United States* v. *Lacher,* 134 U. S. 624, 628; *United States* v. *Gradwell,* 243 U. S. 476, 485; *Fasulo* v. *United States,* 272 U. S. 620, 628. Such indeed is the normal usage of the word "organize," [14] and until the decisions below in this case the federal trial courts in which the question had arisen uniformly gave it that meaning. See *United States* v. *Flynn,* unreported (D. C. S. D. N. Y.), No. C. 137–37, aff'd, 216 F. 2d 354, 358; *United States* v. *Mesarosh,* 116 F. Supp. 345, aff'd, 223 F. 2d 449, 465 (dissenting opinion of Hastie, J.); see also *United States* v. *Dennis,* unreported (D. C. S. D. N. Y.), No. C. 128–87, aff'd, 183 F. 2d 201, 341 U. S. 494.[15]

---

[14] In other contexts state courts have given the term that meaning. See *State ex rel. Childs* v. *School District,* 54 Minn. 213, 55 N. W. 1122; *Whitmire* v. *Cass,* 213 S. C. 230, 236, 49 S. E. 2d 1, 3; *Warren* v. *Barber Asphalt Pav. Co.,* 115 Mo. 572, 576–577, 22 S. W. 490–491; *Commonwealth* v. *Wm. Mann Co.,* 150 Pa. 64, 70, 24 A. 601, 602.

[15] Following the decision of the Court of Appeals for the Ninth Circuit in this case, "organize" has been given its wider meaning by two District Courts in that circuit, *United States* v. *Fujimoto,*

We too think this statute should be read "according to the natural and obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending its operation." *United States* v. *Temple,* 105 U. S. 97, 99.

The Government contends that even if the trial court was mistaken in its construction of the statute, the error was harmless because the conspiracy charged embraced both "advocacy" of violent overthrow and "organizing" the Communist Party, and the jury was instructed that in order to convict it must find a conspiracy extending to both objectives. Hence, the argument is, the jury must in any event be taken to have found petitioners guilty of conspiring to advocate, and the convictions are supportable on that basis alone. We cannot accept this proposition for a number of reasons. The portions of the trial court's instructions relied on by the Government are not sufficiently clear or specific to warrant our drawing the inference that the jury understood it must find an agreement extending to *both* "advocacy" and "organizing" in order to convict.[16] Further, in order to convict, the jury was required, as the court charged, to find an overt act which was "knowingly done in furtherance of an object or purpose of the conspiracy charged in the indictment," and we have no way of knowing whether the overt act found by the jury was one which it believed to be in furtherance

_____

reported on another point, 107 F. Supp. 865, and *United States* v. *Huff,* as yet unreported, now pending on appeal to the Court of Appeals. The Court of Appeals for the Sixth Circuit, following the Ninth Circuit, has likewise given the term its broader meaning. *Wellman* v. *United States,* 227 F. 2d 757.

[16] The trial court did no more on this score than to charge, in the language of the indictment, that the conspiracy had two objects, namely, to advocate and teach forcible overthrow and to organize the Communist Party as a vehicle for that purpose, and then instruct the jury that it must find that "the conspiracy charged in the indictment" had been proved beyond a reasonable doubt.

of the "advocacy" rather than the "organizing" objective of the alleged conspiracy. The character of most of the overt acts alleged associates them as readily with "organizing" as with "advocacy." [17] In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected. *Stromberg* v. *California,* 283 U. S. 359, 367–368; *Williams* v. *North Carolina,* 317 U. S. 287, 291–292; *Cramer* v. *United States,* 325 U. S. 1, 36, n. 45.

We conclude, therefore, that since the Communist Party came into being in 1945, and the indictment was not returned until 1951, the three-year statute of limitations had run on the "organizing" charge, and required the withdrawal of that part of the indictment from the jury's consideration. *Samuel* v. *United States,* 169 F. 2d 787, 798. See also *Haupt* v. *United States,* 330 U. S. 631, 641, n. 1; *Stromberg* v. *California, supra,* at 368.

## II. *Instructions to the Jury.*

Petitioners contend that the instructions to the jury were fatally defective in that the trial court refused to charge that, in order to convict, the jury must find that the advocacy which the defendants conspired to promote was of a kind calculated to "incite" persons to action for the forcible overthrow of the Government. It is argued that advocacy of forcible overthrow as mere *abstract doctrine* is within the free speech protection of the First

---

[17] Of the 23 overt acts charged, 20 alleged attendance of various defendants at meetings or conventions, and 3 alleged the issuance and circulation of "directives" by certain of the defendants. Only two of the acts alleged were proved. Both were Party meetings unmarked by any advocacy of the type that the petitioners were allegedly conspiring to promote.

Amendment; that the Smith Act, consistently with that constitutional provision, must be taken as proscribing only the sort of advocacy which incites to illegal *action;* and that the trial court's charge, by permitting conviction for mere advocacy, unrelated to its tendency to produce forcible action, resulted in an unconstitutional application of the Smith Act. The Government, which at the trial also requested the court to charge in terms of "incitement," now takes the position, however, that the true constitutional dividing line is not between inciting and abstract advocacy of forcible overthrow, but rather between advocacy as such, irrespective of its inciting qualities, and the mere discussion or exposition of violent overthrow as an abstract theory.

We print in the margin the pertinent parts of the trial court's instructions.[18] After telling the jury that it could

---

[18] The trial court charged:

"As used in the Smith Act and the indictment:

"(1) the word 'advocate' means to urge or 'to plead in favor of; . . . to support, vindicate, or recommend publicly . . .';

"(2) the word 'teach' means 'to instruct . . . show how . . . to guide the studies of . . .';

.        .        .        .        .

"The holding of a belief or opinion does not constitute advocacy or teaching. Hence the Smith Act does not prohibit persons who may believe that the violent overthrow and destruction of the Government of the United States is probable or inevitable from expressing that belief. Whether such belief be reasonable or unreasonable is immaterial. Prediction or prophecy is not advocacy.

"Any advocacy or teaching which does not include the urging of force and violence as the means of overthrowing and destroying the Government of the United States is not within the issue of the indictment here and can constitute no basis for any finding against the defendants.

"The kind of advocacy and teaching which is charged and upon which your verdict must be reached is not merely a desirability but a necessity that the Government of the United States be overthrown and destroyed by force and violence and not merely a propriety

not convict the defendants for holding or expressing mere opinions, beliefs, or predictions relating to violent overthrow, the trial court defined the content of the proscribed advocacy or teaching in the following terms, which are crucial here:

> "Any advocacy or teaching which does not include the urging of force and violence as the means of overthrowing and destroying the Government of the United States is not within the issue of the indictment here and can constitute no basis for any finding against the defendants.

> "The kind of advocacy and teaching which is charged and upon which your verdict must be

---

but a duty to overthrow and destroy the Government of the United States by force and violence.

.       .       .       .       .

"The word 'wilfully,' as used in the indictment, means a statement or declaration made or other act done with the specific intent to cause or bring about the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit.

"The defendants, in common with all other persons living under our Constitution, have a general right protected by the First Amendment to hold, express, teach and advocate opinions, even though their opinions are rejected by the overwhelming majority of the American people; and have the further right to organize or combine peaceably with other persons for the purpose of spreading and promoting their opinions more effectively.

"Whether you agree with these opinions or whether they seem to you reasonable, unreasonable, absurd, distasteful or hateful has no bearing whatever on the right of other persons to maintain them and to seek to persuade others of their validity.

"No inference that any of the defendants knowingly and wilfully conspired as charged in the indictment, or intended to cause or bring about the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit, may be drawn from the advocacy or teaching of

reached is not merely a desirability but a necessity that the Government of the United States be overthrown and destroyed by force and violence and not merely a propriety but a duty to overthrow and destroy the Government of the United States by force and violence."

There can be no doubt from the record that in so instructing the jury the court regarded as immaterial, and intended to withdraw from the jury's consideration, any issue as to the character of the advocacy in terms of its capacity to stir listeners to forcible action. Both the petitioners and the Government submitted proposed instructions which would have required the jury to find

socialism or other economic or political or social doctrines, by reason of any unpopularity of such doctrines or by reason of any opinion you may hold with respect to whether such doctrines, or the opinions or beliefs of any of the defendants, are unreasonable, distasteful, absurd or hateful.

"The defendants, in common with other persons living under our Constitution, have the right protected by the First Amendment to criticize our system of Government and the Government itself, even though the speaking or writing of such criticism may undermine confidence in the Government or cause or increase discontent. They have the right also to criticize the foreign policy of the United States and the role being played by this country in international affairs; and to praise the foreign policy of other governments and the role being played by those governments in international affairs.

"The right of the defendants to enjoy such freedom of expression is unaffected by whether or not the opinions spoken or published may seem to you to be crudely intemperate, or to contain falsehoods, or to be designed to embarrass the Government. No inference of conspiracy to advocate and teach the necessity and duty of overthrow and destruction of the Government of the United States by force and violence, or of intent to cause or bring about the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit, may be drawn from such expressions alone."

that the proscribed advocacy was not of a mere abstract doctrine of forcible overthrow, but of action to that end, by the use of language reasonably and ordinarily calculated to incite persons to such action.[19]  The trial court rejected these proposed instructions on the ground that any necessity for giving them which may have existed at

----

[19] Petitioners' proposed instructions were:

"Where the Smith Act, the statute which these defendants are charged with conspiring to violate, speaks of advocating and teaching the duty and necessity of overthrowing the Government by force and violence, this refers only to statements which, in the language of incitement to action, urge immediate action to overthrow the then existing government under the then existing circumstances.  A statement on the other hand, that, if our form of government should change in the future, violent overthrow of the government would then become necessary and right, is not within the Smith Act's prohibition and would not constitute any basis for a finding against the defendants here.

.        .        .        .        .

"For purposes of this trial, a person can be said to teach or advocate the overthrow and destruction of the Government of the United States by force and violence only when his expressions are designed to induce action, rather than discussion or belief, and only when they are expressed in language which, under the circumstances in which it is used, is reasonably and ordinarily calculated to incite persons to such action, rather than merely to discussion or belief.

.        .        .        .        .

"The burden is on the prosecution to show beyond a reasonable doubt that a common understanding existed among the alleged co-conspirators as to the specific content of expressions amounting to advocacy of the overthrow and destruction of the Government by force and violence.  The Government must further show that this understanding included an understanding that such advocacy would be in language amounting to incitement to action and that it would take place under circumstances such as to lead to a probability that it would inspire persons to take action toward violent overthrow.

"The Government's burden is not met by proof that the defendant shared certain beliefs and made joint efforts to persuade other persons to adopt them, no matter what you may find the content of such

the time the *Dennis* case was tried [20] was removed by this Court's subsequent decision in that case. The court made it clear in colloquy with counsel that in its view the illegal advocacy was made out simply by showing that what was said dealt with forcible overthrow and that it was uttered with a specific intent to accomplish that purpose,[21] insisting that all such advocacy was punish-

---

beliefs to have been, or whether you may agree or disagree with such beliefs."

The Government's proposed instruction was:

"In further construction and interpretation of the statute I charge you that it is not the abstract doctrine of overthrowing or destroying organized government by unlawful means which is denounced by this law, but the teaching and advocacy of action for the accomplishment of that purpose, by language reasonably and ordinarily calculated to incite persons to such action. Accordingly, you cannot find the defendants or any of them guilty of the crime charged unless you are satisfied beyond a reasonable doubt that they conspired to organize a society, group and assembly of persons who teach and advocate the overthrow or destruction of the Government of the United States by force and violence and to advocate and teach the duty and necessity of overthrowing or destroying the Government of the United States by force and violence, with the intent that such teaching and advocacy be of a rule or principle of action and by language reasonably and ordinarily calculated to incite persons to such action, all with the intent to cause the overthrow or destruction of the Government of the United States by force and violence as speedily as circumstances would permit."

[20] The Government's proposed instruction was that given by the trial court in the *Dennis* case, 341 U. S. 494. See p. 326, *infra*.

[21] Having stated that all advocacy and teaching of forcible overthrow of Government was punishable "whether it is language of incitement or not," so long as it was done with the requisite intent, the court added, "It seems to me this question of 'incitement to' is involved around the question of sufficiency of evidence to indicate intent. The language used is language of philosophy and theory and academic treatment, rather than language . . . [of] 'incitement to action.' If the jury should convict on that sort of language, [the] argument would be the evidence was insufficient to sustain the conviction . . . ."

able "whether it is language of incitement or not." The Court of Appeals affirmed on a different theory, as we shall see later on.

We are thus faced with the question whether the Smith Act prohibits advocacy and teaching of forcible overthrow as an abstract principle, divorced from any effort to instigate action to that end, so long as such advocacy or teaching is engaged in with evil intent. We hold that it does not.

The distinction between advocacy of abstract doctrine and advocacy directed at promoting unlawful action is one that has been consistently recognized in the opinions of this Court, beginning with *Fox* v. *Washington,* 236 U. S. 273, and *Schenck* v. *United States,* 249 U. S. 47.[22] This distinction was heavily underscored in *Gitlow* v. *New York,* 268 U. S. 652, in which the statute involved[23] was nearly identical with the one now before us, and where the Court, despite the narrow view there taken of the First Amendment,[24] said:

> "The statute does not penalize the utterance or publication of abstract 'doctrine' or academic discussion having no quality of incitement to any concrete action. . . . It is not the abstract 'doctrine' of overthrowing organized government by unlawful means which is denounced by the statute, but the advocacy of action for the accomplishment of that purpose. . . . This [Manifesto] . . . is [in] the language of direct incitement. . . . That the jury were warranted in finding that the Manifesto advocated not merely the abstract doctrine of overthrowing organized government by force, violence and

---

[22] For discussion of the principal cases in this Court on the subject, see the several opinions in *Dennis* v. *United States, supra.*

[23] The New York Criminal Anarchy Act, note 13, *supra.*

[24] See *Dennis* v. *United States, supra,* at 541.

unlawful means, but action to that end, is clear. . . . That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear." *Id.*, at 664–669.

We need not, however, decide the issue before us in terms of constitutional compulsion, for our first duty is to construe this statute. In doing so we should not assume that Congress chose to disregard a constitutional danger zone so clearly marked, or that it used the words "advocate" and "teach" in their ordinary dictionary meanings when they had already been construed as terms of art carrying a special and limited connotation. See *Willis* v. *Eastern Trust & Banking Co., supra; Joines* v. *Patterson, supra; James* v. *Appel,* 192 U. S. 129, 135. The *Gitlow* case and the New York Criminal Anarchy Act there involved, which furnished the prototype for the Smith Act, were both known and adverted to by Congress in the course of the legislative proceedings.[25] Cf. *Carolene Products Co.* v. *United States, supra.* The legislative history of the Smith Act and related bills shows beyond all question that Congress was aware of the distinction between the advocacy or teaching of abstract doctrine and the advocacy or teaching of action, and that it did not intend to disregard it.[26] The statute was aimed

---

[25] Hearings on H. R. 4313 and H. R. 6427, May 22, 1935, at pp. 5, 6, cited in note 8, *supra.*

[26] At the hearing cited in note 8, *supra,* Representative McCormack repeatedly emphasized that the proscribed advocacy was *inciting* advocacy. For example, he stated: ". . . the word 'advocacy' means 'in a manner to incite,' as construed by the Supreme Court in the *Gitlow case* . . . ." (P. 5.) ". . . Government has a right to make it a crime for a person to use language specifically inciting to the commission of illegal acts. . . . [I]t is advocacy in the manner to incite, knowingly to advocate in a manner to incite to the overthrow of the Government . . . ." (P. 15.) See also pp. 4, 8, 11.

at the advocacy and teaching of concrete action for the forcible overthrow of the Government, and not of principles divorced from action.

The Government's reliance on this Court's decision in *Dennis* is misplaced. The jury instructions which were refused here were given there,[27] and were referred to by this Court as requiring "the jury to find the facts *essential* to establish the substantive crime." 341 U. S., at 512 (emphasis added). It is true that at one point in the late Chief Justice's opinion it is stated that the Smith Act "is directed at advocacy, not discussion," *id.*, at 502, but it is clear that the reference was to advocacy of action, not ideas, for in the very next sentence the opinion emphasizes that the jury was properly instructed that there could be no conviction for "advocacy in the realm of ideas." The two concurring opinions in that case likewise emphasize the distinction with which we are concerned. *Id.*, at 518, 534, 536, 545, 546, 547, 571, 572.

In failing to distinguish between advocacy of forcible overthrow as an abstract doctrine and advocacy of action to that end, the District Court appears to have been led astray by the holding in *Dennis* that advocacy of violent action to be taken at some future time was enough. It seems to have considered that, since "inciting" speech is usually thought of as something calculated to induce immediate action, and since *Dennis* held advocacy of action for future overthrow sufficient, this meant that advocacy, irrespective of its tendency to generate action, is punishable, provided only that it is uttered with a specific intent to accomplish overthrow. In other words, the District Court apparently thought that *Dennis* obliterated the traditional dividing line between advocacy of abstract doctrine and advocacy of action.[28]

---

[27] See p. 326, *infra.*

[28] See *United States* v. *Schneiderman,* 106 F. Supp. 906, 923.

This misconceives the situation confronting the Court in *Dennis* and what was held there. Although the jury's verdict, interpreted in light of the trial court's instructions,[29] did not justify the conclusion that the defendants' advocacy was directed at, or created any danger of, immediate overthrow, it did establish that the advocacy was aimed at building up a seditious group and maintaining it in readiness for action at a propitious time. In such circumstances, said Chief Justice Vinson, the Government need not hold its hand "until the *putsch* is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required." 341 U. S., at 509. The essence of the *Dennis* holding was that indoctrination of a group in preparation for future violent action, as well as exhortation to immediate action, by advocacy found to be directed to "action for the accomplishment" of forcible overthrow, to violence as "a rule or principle of action," and employing "language of incitement," *id.,* at 511–512, is not constitutionally protected when the group is of sufficient size and cohesiveness, is sufficiently oriented towards action, and other circumstances are such as reasonably to justify apprehension that action will occur. This is quite a different thing from the view of the District Court here that mere doctrinal justification of forcible overthrow, if engaged in with the intent to accomplish overthrow, is punishable *per se* under the Smith Act. That sort of advocacy, even though uttered with the hope that it may ultimately lead to violent revolution, is too remote from concrete action to be regarded

---

[29] The writ of certiorari in *Dennis* did not bring up the sufficiency of the evidence. 340 U. S. 863.

as the kind of indoctrination preparatory to action which was condemned in *Dennis*. As one of the concurring opinions in *Dennis* put it: "Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken." *Id.*, at 545. There is nothing in *Dennis* which makes that historic distinction obsolete.

The Court of Appeals took a different view from that of the District Court. While seemingly recognizing that the proscribed advocacy must be associated in some way with action, and that the instructions given the jury here fell short in that respect, it considered that the instructions which the trial court refused were unnecessary in this instance because establishment of the conspiracy, here charged under the general conspiracy statute, required proof of an overt act, whereas in *Dennis*, where the conspiracy was charged under the Smith Act, no overt act was required.[30] In other words, the Court of Appeals thought that the requirement of proving an overt act was an adequate substitute for the linking of the advocacy to action which would otherwise have been necessary.[31] This, of course, is a mistaken notion, for the

---

[30] See note 1, *supra*.

[31] The Court of Appeals stated, 225 F. 2d, at 151:

"Finally, [referring to *Dennis*] the opinion of the Court of Appeals and a concurring opinion in the Supreme Court gave approval of instructions of the trial judge in Dennis requiring the jury to find 'language of incitement' was used by the conspirators there. Another phrase given approval is that the doctrine of destruction had become a 'rule of action.' In conjunction with an indictment based upon such a statute proscribing organization for the purpose of teaching and advocating overthrow, but which required neither proof of overt acts nor a specifically planned objective, such precautionary instructions were well enough. But these expressions of the judges in instructions in connection with the original statute established no unalterable requirement that such phrases themselves be used

overt act will not necessarily evidence the character of the advocacy engaged in, nor, indeed, is an agreement to advocate forcible overthrow itself an unlawful conspiracy if it does not call for advocacy of action. The statement in *Dennis* that "it is the existence of the conspiracy which creates the danger," 341 U. S., at 511, does not support the Court of Appeals. Bearing in mind that *Dennis,* like all other Smith Act conspiracy cases thus far, including this one, involved advocacy which had already taken place, and not advocacy still to occur, it is clear that in context the phrase just quoted referred to more than the basic agreement to advocate. "The mere fact that [during the indictment period] petitioners' activities did not result in an attempt to overthrow the Government by force and violence is of course no answer to the fact that there was a group that was *ready to make the attempt.* The formation by petitioners of such a highly organized conspiracy, with rigidly disciplined members subject to call when the leaders, these petitioners, felt that

*ipsissimis verbis* where the changes in the basic law and an entirely different indictment predicated upon the conspiracy statute have rendered admonitions to a jury in such language supererogatory." And further at p. 162:

"The gist of the substantive crime of conspiracy is that an unlawful combination and agreement becomes a positive crime only when some of the proved conspirators enter the field of action pursuant to the criminal design. Therefore, if the conspiracy did not become a rule of action pursuant to the proscribed intent, there would have been no violation of the conspiracy statute. The use of such phrases [as incitement] in instructions might have been well enough where a violation of the Smith Act alone was charged in its original form. It would be folly to command imperatively that these specific phrases be each used in instructions after a trial on an indictment such as the present one."

It may also be noted that for the period 1940 to September 1, 1948 (see note 1, *supra*), the conspiracy charge here was laid under the old Smith Act.

the time had come *for action,* coupled with . . . world conditions, . . . disposes of the contention that a conspiracy to advocate, as distinguished from the advocacy itself, cannot be constitutionally restrained, because it comprises only the preparation. It is the existence of the conspiracy which creates the danger. . . . If the ingredients of the reaction are present, we cannot bind the Government to wait until the catalyst is added." 341 U. S., at 510–511 (emphasis supplied). The reference of the term "conspiracy," in context, was to an agreement to *accomplish* overthrow at some future time, implicit in the jury's findings under the instructions given, rather than to an agreement to speak. *Dennis* was thus not concerned with a conspiracy to engage at some future time in seditious advocacy, but rather with a conspiracy to advocate presently the taking of forcible action in the future. It was action, not advocacy, that was to be postponed until "circumstances" would "permit." We intimate no views as to whether a conspiracy to engage in advocacy in the future, where speech would thus be separated from action by one further remove, is punishable under the Smith Act.

We think, thus, that both of the lower courts here misconceived *Dennis.*

In light of the foregoing we are unable to regard the District Court's charge upon this aspect of the case as adequate. The jury was never told that the Smith Act does not denounce advocacy in the sense of preaching abstractly the forcible overthrow of the Government. We think that the trial court's statement that the proscribed advocacy must include the "urging," "necessity," and "duty" of forcible overthrow, and not merely its "desirability" and "propriety," may not be regarded as a sufficient substitute for charging that the Smith Act reaches only advocacy of action for the overthrow of government by force and violence. The essential distinction

is that those to whom the advocacy is addressed must be urged to *do* something, now or in the future, rather than merely to *believe* in something. At best the expressions used by the trial court were equivocal, since in the absence of any instructions differentiating advocacy of abstract doctrine from advocacy of action, they were as consistent with the former as they were with the latter. Nor do we regard their ambiguity as lessened by what the trial court had to say as to the right of the defendants to announce their beliefs as to the inevitability of violent revolution, or to advocate other unpopular opinions. Especially when it is unmistakable that the court did not consider the urging of action for forcible overthrow as being a necessary element of the proscribed advocacy, but rather considered the crucial question to be whether the advocacy was uttered with a specific intent to accomplish such overthrow,[32] we would not be warranted in assuming that the jury drew from these instructions more than the court itself intended them to convey.

Nor can we accept the Government's argument that the District Court was justified in not charging more than it did because the refused instructions proposed by both sides specified that the advocacy must be of a character reasonably calculated to "incite" to forcible overthrow, a term which, it is now argued, might have conveyed to the jury an implication that the advocacy must be of immediate action. Granting that some qualification of the proposed instructions would have been permissible to dispel such an implication, and that it was not necessary even that the trial court should have employed the particular term "incite," it was nevertheless incumbent on the court to make clear in some fashion that the advocacy must be of action and not merely abstract doctrine. The instructions given not only do not employ the word

---

[32] See pp. 317–318, *supra*.

"incite," but also avoid the use of such terms and phrases as "action," "call for action," "as a rule or principle of action," and so on, all of which were offered in one form or another by both the petitioners and the Government.[33]

What we find lacking in the instructions here is illustrated by contrasting them with the instructions given to the *Dennis* jury, upon which this Court's sustaining of the convictions in that case was bottomed. There the trial court charged:

> "In further construction and interpretation of the statute [the Smith Act] I charge you that it is *not the abstract doctrine* of overthrowing or destroying organized government by unlawful means which is denounced by this law, but the teaching and advocacy *of action* for the accomplishment of that purpose, *by language reasonably and ordinarily calculated to incite persons to such action.* Accordingly, you cannot find the defendants or any of them guilty of the crime charged unless you are satisfied beyond a reasonable doubt that they conspired . . . to advocate and teach the duty and necessity of overthrowing or destroying the Government of the United States by force and violence, with the intent that such teaching and advocacy *be of a rule or principle of action* and *by language reasonably and ordinarily calculated to incite persons to such action,* all with the intent to cause the overthrow . . . as speedily as circumstances would permit." (Emphasis added.) 9 F. R. D. 367, 391; and see 341 U. S., at 511–512.

We recognize that distinctions between advocacy or teaching of abstract doctrines, with evil intent, and that which is directed to stirring people to action, are often subtle and difficult to grasp, for in a broad sense, as Mr. Justice Holmes said in his dissenting opinion in *Gitlow,*

---

[33] See note 19, *supra*.

*supra,* 268 U. S., at 673: "Every idea is an incitement." But the very subtlety of these distinctions required the most clear and explicit instructions with reference to them, for they concerned an issue which went to the very heart of the charges against these petitioners. The need for precise and understandable instructions on this issue is further emphasized by the equivocal character of the evidence in this record, with which we deal in Part III of this opinion. Instances of speech that could be considered to amount to "advocacy of action" are so few and far between as to be almost completely overshadowed by the hundreds of instances in the record in which overthrow, if mentioned at all, occurs in the course of doctrinal disputation so remote from action as to be almost wholly lacking in probative value. Vague references to "revolutionary" or "militant" action of an unspecified character, which are found in the evidence, might in addition be given too great weight by the jury in the absence of more precise instructions. Particularly in light of this record, we must regard the trial court's charge in this respect as furnishing wholly inadequate guidance to the jury on this central point in the case. We cannot allow a conviction to stand on such "an equivocal direction to the jury on a basic issue." *Bollenbach* v. *United States,* 326 U. S. 607, 613.

### III. *The Evidence.*

The determinations already made require a reversal of these convictions. Nevertheless, in the exercise of our power under 28 U. S. C. § 2106 to "direct the entry of such appropriate judgment . . . as may be just under the circumstances," we have conceived it to be our duty to scrutinize this lengthy record [34] with care, in order to determine whether the way should be left open for a new trial of all or some of these petitioners. Such a judgment, we

---

[34] The record consists of some 14,000 typewritten pages.

think, should, on the one hand, foreclose further proceedings against those of the petitioners as to whom the evidence in this record would be palpably insufficient upon a new trial, and should, on the other hand, leave the Government free to retry the other petitioners under proper legal standards, especially since it is by no means clear that certain aspects of the evidence against them could not have been clarified to the advantage of the Government had it not been under a misapprehension as to the burden cast upon it by the Smith Act. In judging the record by these criteria we do not apply to these cases the rigorous standards of review which, for example, the Court of Appeals would be required to apply in reviewing the evidence if any of these petitioners are convicted upon a retrial. Compare *Dennis* v. *United States, supra,* at 516. Rather, we have scrutinized the record to see whether there are individuals as to whom acquittal is unequivocally demanded. We do this because it is in general too hypothetical and abstract an inquiry to try to judge whether the evidence would have been inadequate had the cases been submitted under a proper charge, and had the Government realized that all its evidence must be channeled into the "advocacy" rather than the "organizing" charge. We think we may do this by drawing on our power under 28 U. S. C. § 2106, because under that statute we would no doubt be justified in refusing to order acquittal even where the evidence might be deemed palpably insufficient, particularly since petitioners have asked in the alternative for a new trial as well as for acquittal. See *Bryan* v. *United States,* 338 U. S. 552.

On this basis we have concluded that the evidence against petitioners Connelly, Kusnitz, Richmond, Spector, and Steinberg is so clearly insufficient that their acquittal should be ordered, but that as to petitioners Carlson, Dobbs, Fox, Healey (Mrs. Connelly), Lambert, Lima, Schneiderman, Stack, and Yates, we would not be justi-

fied in closing the way to their retrial. We proceed to the reasons for these conclusions.

At the outset, in view of the conclusions reached in Part I of this opinion, we must put aside as against all petitioners the evidence relating to the "organizing" aspect of the alleged conspiracy, except insofar as it bears upon the "advocacy" charge. That, indeed, dilutes in a substantial way a large part of the evidence, for the record unmistakably indicates that the Government relied heavily on its "organizing" charge. Two further general observations should also be made about the evidence as to the "advocacy" charge. The first is that both the Government and the trial court evidently proceeded on the theory that advocacy of abstract doctrine was enough to offend the Smith Act, whereas, as we have held, it is only advocacy of forcible action that is proscribed. The second observation is that both the record and the Government's brief in this Court make it clear that the Government's thesis was that the Communist Party, or at least the Communist Party of California, constituted the conspiratorial group, and that membership in the conspiracy could therefore be proved by showing that the individual petitioners were actively identified with the Party's affairs and thus inferentially parties to its tenets. This might have been well enough towards making out the Government's case if advocacy of the abstract doctrine of forcible overthrow satisfied the Smith Act, for we would at least have little difficulty in saying on this record that a jury could justifiably conclude that such was one of the tenets of the Communist Party; and there was no dispute as to petitioners' active identification with Party affairs. But when it comes to Party advocacy or teaching in the sense of a call to forcible action at some future time we cannot but regard this record as strikingly deficient. At best this voluminous record shows but a half dozen or so scattered incidents which, even under the loosest

standards, could be deemed to show such advocacy. Most of these were not connected with any of the petitioners, or occurred many years before the period covered by the indictment. We are unable to regard this sporadic showing as sufficient to justify viewing the Communist Party as the nexus between these petitioners and the conspiracy charged. We need scarcely say that however much one may abhor even the abstract preaching of forcible overthrow of government, or believe that forcible overthrow is the ultimate purpose to which the Communist Party is dedicated, it is upon the evidence in the record that the petitioners must be judged in this case.

We must, then, look elsewhere than to the evidence concerning the Communist Party as such for the existence of the conspiracy to advocate charged in the indictment. As to the petitioners Connelly, Kusnitz, Richmond, Spector, and Steinberg we find no adequate evidence in the record which would permit a jury to find that they were members of such a conspiracy. For all purposes relevant here, the sole evidence as to them was that they had long been members, officers or functionaries of the Communist Party of California; and that standing alone, as Congress has enacted in § 4 (f) of the Internal Security Act of 1950,[35] makes out no case against them. So far as this record shows, none of them has engaged in or been associated with any but what appear to have been wholly lawful activities,[36] or has ever made a single remark or

---

[35] 64 Stat. 987, 50 U. S. C. § 783 (f): "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute."

[36] While there was evidence that might tend to link petitioner Richmond to "the conspiracy," i. e., evidence of association by him with other petitioners, and with an individual who might be found by the jury to have engaged during the same period in the proscribed advocacy, see pp. 332–333, infra, we think that without more such evidence would not justify refusal to direct an acquittal.

been present when someone else made a remark, which would tend to prove the charges against them. Connelly and Richmond were, to be sure, the Los Angeles and Executive Editors, respectively, of the Daily People's World, the West Coast Party organ, but we can find nothing in the material introduced into evidence from that newspaper which advances the Government's case.

Moreover, apart from the inadequacy of the evidence to show, at best, more than the abstract advocacy and teaching of forcible overthrow by the Party, it is difficult to perceive how the requisite specific intent to accomplish such overthrow could be deemed proved by a showing of mere membership or the holding of office in the Communist Party. We therefore think that as to these petitioners the evidence was entirely too meagre to justify putting them to a new trial, and that their acquittal should be ordered.

As to the nine remaining petitioners, we consider that a different conclusion should be reached. There was testimony from the witness Foard, and other evidence, tying Fox, Healey, Lambert, Lima, Schneiderman, Stack, and Yates to Party classes conducted in the San Francisco area during the year 1946, where there occurred what might be considered to be the systematic teaching and advocacy of illegal action which is condemned by the statute. It might be found that one of the purposes of such classes was to develop in the members of the group a readiness to engage at the crucial time, perhaps during war or during attack upon the United States from without, in such activities as sabotage and street fighting, in order to divert and diffuse the resistance of the authorities and if possible to seize local vantage points. There was also testimony as to activities in the Los Angeles area, during the period covered by the indictment, which might be considered to amount to "advocacy of action," and with which petitioners Carlson and Dobbs were linked. From the

testimony of the witness Scarletto, it might be found that individuals considered to be particularly trustworthy were taken into an "underground" apparatus and there instructed in tasks which would be useful when the time for violent action arrived. Scarletto was surreptitiously indoctrinated in methods, as he said, of moving "masses of people in time of crisis." It might be found, under all the circumstances, that the purpose of this teaching was to prepare the members of the underground apparatus to engage in, to facilitate, and to cooperate with violent action directed against government when the time was ripe. In short, while the record contains evidence of little more than a general program of educational activity by the Communist Party which included advocacy of violence as a theoretical matter, we are not prepared to say, at this stage of the case, that it would be impossible for a jury, resolving all conflicts in favor of the Government and giving the evidence as to these San Francisco and Los Angeles episodes its utmost sweep, to find that advocacy of action was also engaged in when the group involved was thought particularly trustworthy, dedicated, and suited for violent tasks.

Nor can we say that the evidence linking these nine petitioners to that sort of advocacy, with the requisite specific intent, is so tenuous as not to justify their retrial under proper legal standards. Fox, Healey, Lambert, Lima, Schneiderman, Stack, and Yates, as members of the State and San Francisco County Boards, were shown to have been closely associated with Ida Rothstein, the principal teacher of the San Francisco classes, who also during this same period arranged in a devious and conspiratorial manner for the holding of Board meetings at the home of the witness Honig, which were attended by these petitioners. It was also shown that from time to time instructions emanated from the Boards or their members to instructors of groups at lower levels. And while none

of the written instructions produced at the trial were invidious in themselves, it might be inferred that additional instructions were given which were not reduced to writing. Similarly, there was evidence of close association between petitioners Carlson and Dobbs and associates or superiors of the witness Scarletto, which might be taken as indicating that these two petitioners had knowledge of the apparatus in which Scarletto was active. And finally, all of these nine petitioners were shown either to have made statements themselves, or apparently approved statements made in their presence, which a jury might take as some evidence of their participation with the requisite intent in a conspiracy to advocate illegal action.

As to these nine petitioners, then, we shall not order an acquittal.

Before leaving the evidence, we consider it advisable, in order to avoid possible misapprehension upon a new trial, to deal briefly with petitioners' contention that the evidence was insufficient to prove the overt act required for conviction of conspiracy under 18 U. S. C. § 371. Only 2 of the 11 overt acts alleged in the indictment to have occurred within the period of the statute of limitations were proved. Each was a public meeting held under Party auspices at which speeches were made by one or more of the petitioners extolling leaders of the Soviet Union and criticizing various aspects of the foreign policy of the United States. At one of the meetings an appeal for funds was made. Petitioners contend that these meetings do not satisfy the requirement of the statute that there be shown an act done by one of the conspirators "to effect the object of the conspiracy." The Government concedes that nothing unlawful was shown to have been said or done at these meetings, but contends that these occurrences nonetheless sufficed as overt acts under the jury's findings.

We think the Government's position is correct. It is not necessary that an overt act be the substantive crime charged in the indictment as the object of the conspiracy. *Pierce* v. *United States,* 252 U. S. 239, 244; *United States* v. *Rabinowich,* 238 U. S. 78, 86. Nor, indeed, need such an act, taken by itself, even be criminal in character. *Braverman* v. *United States,* 317 U. S. 49. The function of the overt act in a conspiracy prosecution is simply to manifest "that the conspiracy is at work," *Carlson* v. *United States,* 187 F. 2d 366, 370, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence. The substantive offense here charged as the object of the conspiracy is speech rather than the specific action that typically constitutes the gravamen of a substantive criminal offense. Were we to hold that some concrete action leading to the overthrow of the Government was required, as petitioners appear to suggest, we would have changed the nature of the offense altogether. No such drastic change in the law can be drawn from Congress' perfunctory action in 1948 bringing Smith Act cases within 18 U. S. C. § 371.

While upon a new trial the overt act must be found, in view of what we have held, to have been in furtherance of a conspiracy to "advocate," rather than to "organize," we are not prepared to say that one of the episodes relied on here could not be found to be in furtherance of such an objective, if, under proper instructions, a jury should find that the Communist Party was a vehicle through which the alleged conspiracy was promoted. While in view of our acquittal of Steinberg, the first of these episodes, in which he is alleged to have been involved, may no longer be relied on as an overt act, this would not affect the second episode, in which petitioner Schneiderman was alleged and proved to have participated.

For the foregoing reasons we think that the way must be left open for a new trial to the extent indicated.

## IV. *Collateral Estoppel.*

There remains to be dealt with petitioner Schneiderman's claim based on the doctrine of collateral estoppel by judgment. Petitioner urges that in *Schneiderman* v. *United States*, 320 U. S. 118, a denaturalization proceeding in which he was the prevailing party, this Court made determinations favorable to him which are conclusive in this proceeding under the doctrine of collateral estoppel. Specifically, petitioner contends that the *Schneiderman* decision determined, for purposes of this proceeding; (1) that the teaching of Marxism-Leninism by the Communist Party was not necessarily the advocacy of violent overthrow of government; (2) that at least one tenable conclusion to be drawn from the evidence was that the Communist Party desired to achieve its goal of socialism through peaceful means; (3) that it could not be presumed, merely because of his membership or officership in the Communist Party, that Schneiderman adopted an illegal interpretation of Marxist doctrine; and finally, (4) that absent proof of overt acts indicating that Schneiderman personally adopted a reprehensible interpretation, the Government had failed to establish its burden by the clear and unequivocal evidence necessary in a denaturalization case. In the courts below, petitioner urged unsuccessfully that these determinations were conclusive in this proceeding under the doctrine of collateral estoppel, and entitled him either to an acquittal or to special instructions to the jury. He makes the same contentions here.

We are in agreement with petitioner that the doctrine of collateral estoppel is not made inapplicable by the fact that this is a criminal case, whereas the prior proceedings were civil in character. *United States* v. *Oppenheimer*, 242 U. S. 85. We agree further that the nonexistence of a fact may be established by a judgment no less than its

existence; that, in other words, a party may be precluded under the doctrine of collateral estoppel from attempting a second time to prove a fact that he sought unsuccessfully to prove in a prior action. *Sealfon* v. *United States,* 332 U. S. 575. Nor need we quarrel with petitioner's premise that the standard of proof applicable in denaturalization cases is at least no greater than that applicable in criminal proceedings. Compare *Helvering* v. *Mitchell,* 303 U. S. 391; *Murphy* v. *United States,* 272 U. S. 630. We assume, without deciding, that substantially the same standards of proof are applicable in the two types of cases. Cf. *Klapprott* v. *United States,* 335 U. S. 601, 612. Nevertheless, for reasons that will appear, we think that the doctrine of collateral estoppel does not help petitioner here.

We differ with petitioner, first of all, in his estimate of what the *Schneiderman* case determined for purposes of the doctrine of collateral estoppel. That doctrine makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision. *Commissioner* v. *Sunnen,* 333 U. S. 591, 601–602; *Tait* v. *Western Maryland R. Co.,* 289 U. S. 620; *The Evergreens* v. *Nunan,* 141 F. 2d 927, 928. As we read the *Schneiderman* opinion, the only determination essential to the decision was that Schneiderman had not, prior to 1927, adopted an interpretation of the Communist Party's teachings featuring "agitation and exhortation calling for present violent action." 320 U. S., at 157–159. If it be accepted that the holding extended in the alternative to the character of advocacy engaged in by the Communist Party, then the essential finding was that the Party had not, in 1927, engaged in "agitation and exhortation calling for present violent action." *Ibid.* The Court in *Schneiderman* certainly did not purport to determine what the doctrinal content of "Marxism-Leninism" might be at all times and in all places. Nor did it establish that the books and pamphlets introduced against

Schneiderman in that proceeding could not support in any way an inference of criminality, no matter how or by whom they might thereafter be used. At most, we think, it made the determinations we have stated, limited to the time and place that were then in issue.

It is therefore apparent that the determinations made by this Court in *Schneiderman* could not operate as a complete bar to this proceeding. Wholly aside from the fact that the Court was there concerned with the state of affairs existing in 1927, whereas we are concerned here with the period 1948–1951, the issues in the present case are quite different. We are not concerned here with whether petitioner has engaged in "agitation and exhortation calling for present violent action," whether in 1927 or later. Even if it were conclusively established against the Government that neither petitioner nor the Communist Party had ever engaged in such advocacy, that circumstance would constitute no bar to a conviction under 18 U. S. C. § 371 of conspiring to advocate forcible overthrow of government in violation of the Smith Act. It is not necessary for conviction here that advocacy of "present violent action" be proved. Petitioner's demand for judgment of acquittal must therefore be rejected. The decision in *Federal Trade Commission* v. *Cement Institute,* 333 U. S. 683, 708–709, is precisely in point and is controlling.

What we have said we think also disposes of petitioner's contention that the trial court should have instructed the jury that certain evidentiary or subordinate issues must be taken as conclusively determined in his favor. The argument is that the determinations made in the *Schneiderman* case are not wholly irrelevant to this case, even if they do not conclude it, and hence that petitioner should be entitled to an instruction giving those determinations such partial conclusive effect as they might warrant. We think, however, that the doctrine

of collateral estoppel does not establish any such concept of "conclusive evidence" as that contended for by petitioner. The normal rule is that a prior judgment need be given no conclusive effect at all unless it establishes one of the ultimate facts in issue in the subsequent proceeding. So far as merely evidentiary or "mediate" facts are concerned, the doctrine of collateral estoppel is inoperative. *The Evergreens* v. *Nunan,* 141 F. 2d 927; Restatement, Judgments § 68, comment *p.* Whether there are any circumstances in which the giving of limiting instructions such as those requested here might be necessary or proper, we need not now determine. Cf. *Bordonaro Bros. Theatres, Inc.* v. *Paramount Pictures, Inc.,* 203 F. 2d 676, 678. It is sufficient for us to hold that in this case the matters of fact and mixed fact and law necessarily determined by the prior judgment, limited as they were to the year 1927, were so remote from the issues as to justify their exclusion from evidence in the discretion of the trial judge.

Since there must be a new trial, we have not found it necessary to deal with the contentions of the petitioners as to the fairness of the trial already held. The judgment of the Court of Appeals is reversed, and the case remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Burton, concurring in the result.

I agree with the result reached by the Court, and with the opinion of the Court except as to its interpretation of the term "organize" as used in the Smith Act. As to that, I agree with the interpretation given it by the Court of Appeals. 225 F. 2d 146.

Mr. Justice Brennan and Mr. Justice Whittaker took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring in part and dissenting in part.

## I.

I would reverse every one of these convictions and direct that all the defendants be acquitted.  In my judgment the statutory provisions on which these prosecutions are based abridge freedom of speech, press and assembly in violation of the First Amendment to the United States Constitution.  See my dissent and that of MR. JUSTICE DOUGLAS in *Dennis* v. *United States,* 341 U. S. 494, 579, 581.  Also see my opinion in *American Communications Assn.* v. *Douds,* 339 U. S. 382, 445.

The kind of trials conducted here are wholly dissimilar to normal criminal trials.  Ordinarily these "Smith Act" trials are prolonged affairs lasting for months.  In part this is attributable to the routine introduction in evidence of massive collections of books, tracts, pamphlets, newspapers, and manifestoes discussing Communism, Socialism, Capitalism, Feudalism and governmental institutions in general, which, it is not too much to say, are turgid, diffuse, abstruse, and just plain dull.  Of course, no juror can or is expected to plow his way through this jungle of verbiage.  The testimony of witnesses is comparatively insignificant.  Guilt or innocence may turn on what Marx or Engels or someone else wrote or advocated as much as a hundred or more years ago.  Elaborate, refined distinctions are drawn between "Communism," "Marxism," "Leninism," "Trotskyism," and "Stalinism."  When the propriety of obnoxious or unorthodox views about government is in reality made the crucial issue, as it must be in cases of this kind, prejudice makes conviction inevitable except in the rarest circumstances.

## II.

Since the Court proceeds on the assumption that the statutory provisions involved are valid, however, I feel free to express my views about the issues it considers.

*First.*—I agree with Part I of the Court's opinion that deals with the statutory term, "organize," and holds that the organizing charge in the indictment was barred by the three-year statute of limitations.

*Second.*—I also agree with the Court insofar as it holds that the trial judge erred in instructing that persons could be punished under the Smith Act for teaching and advocating forceful overthrow as an abstract principle. But on the other hand, I cannot agree that the instruction which the Court indicates it might approve is constitutionally permissible. The Court says that persons can be punished for advocating action to overthrow the Government by force and violence, where those to whom the advocacy is addressed are urged "to *do* something, now or in the future, rather than merely to *believe* in something." Under the Court's approach, defendants could still be convicted simply for agreeing to talk as distinguished from agreeing to act. I believe that the First Amendment forbids Congress to punish people for talking about public affairs, whether or not such discussion incites to action, legal or illegal. See Meiklejohn, Free Speech and Its Relation to Self-Government. Cf. Chafee, Book Review, 62 Harv. L. Rev. 891. As the Virginia Assembly said in 1785, in its "Statute for Religious Liberty," written by Thomas Jefferson, "it is time enough for the rightful purposes of civil government, for its officers to interfere when principles break out into overt acts against peace and good order. . . ." * Cf. *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 501–502; *Labor*

---

*12 Hening's Stat. (Virginia 1823), c. 34, p. 85.

*Board* v. *Virginia Electric & P. Co.,* 314 U. S. 469, 476–480; *Virginia Electric & P. Co.* v. *Labor Board,* 319 U. S. 533, 539.

*Third.*—I also agree with the Court that petitioners, Connelly, Kusnitz, Richmond, Spector, and Steinberg, should be ordered acquitted since there is no evidence that they have ever engaged in anything but "wholly lawful activities." But in contrast to the Court, I think the same action should also be taken as to the remaining nine defendants. The Court's opinion summarizes the strongest evidence offered against these defendants. This summary reveals a pitiful inadequacy of proof to show beyond a reasonable doubt that the defendants were guilty of conspiring to incite persons to act to overthrow the Government. The Court says:

> "In short, while the record contains evidence of little more than a general program of educational activity by the Communist Party which included advocacy of violence as a theoretical matter, we are not prepared to say, at this stage of the case, that it would be impossible for a jury, resolving all conflicts in favor of the Government and giving the evidence as to these San Francisco and Los Angeles episodes its utmost sweep, to find that advocacy of action was also engaged in when the group involved was thought particularly trustworthy, dedicated, and suited for violent tasks."

It seems unjust to compel these nine defendants, who have just been through one four-month trial, to go through the ordeal of another trial on the basis of such flimsy evidence. As the Court's summary demonstrates, the evidence introduced during the trial against these defendants was insufficient to support their conviction. Under such circumstances, it was the duty of the trial judge to direct a verdict of acquittal. If the jury had

been discharged so that the Government could gather additional evidence in an attempt to convict, such a discharge would have been a sound basis for a plea of former jeopardy in a second trial. See *Wade v. Hunter,* 336 U. S. 684, and cases cited there. I cannot agree that "justice" requires this Court to send these cases back to put these defendants in jeopardy again in violation of the spirit if not the letter of the Fifth Amendment's provision against double jeopardy.

*Fourth.*—The section under which this conspiracy indictment was brought, 18 U. S. C. § 371, requires proof of an overt act done "to effect the object of the conspiracy." Originally, 11 such overt acts were charged here. These 11 have now dwindled to 2, and as the Court says:

> "Each was a public meeting held under Party auspices at which speeches were made by one or more of the petitioners extolling leaders of the Soviet Union and criticizing various aspects of the foreign policy of the United States. At one of the meetings an appeal for funds was made. Petitioners contend that these meetings do not satisfy the requirement of the statute that there be shown an act done by one of the conspirators 'to effect the object of the conspiracy.' The Government concedes that nothing unlawful was shown to have been said or done at these meetings, but contends that these occurrences nonetheless sufficed as overt acts under the jury's findings."

The Court holds that attendance at these lawful and orderly meetings constitutes an "overt act" sufficient to meet the statutory requirements. I disagree.

The requirement of proof of an overt act in conspiracy cases is no mere formality, particularly in prosecutions like these which in many respects are akin to trials for treason. Article III, § 3, of the Constitution provides

that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." One of the objects of this provision was to keep people from being convicted of disloyalty to government during periods of excitement when passions and prejudices ran high, merely because they expressed "unacceptable" views. See *Cramer* v. *United States,* 325 U. S. 1, 48. The same reasons that make proof of overt acts so important in treason cases apply here. The only overt act which is now charged against these defendants is that they went to a constitutionally protected public assembly where they took part in lawful discussion of public questions, and where neither they nor anyone else advocated or suggested overthrow of the United States Government. Many years ago this Court said that "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States* v. *Cruikshank,* 92 U. S. 542, 552. And see *De Jonge* v. *Oregon,* 299 U. S. 353, 364–365. In my judgment defendants' attendance at these public meetings cannot be viewed as an overt act to effectuate the object of the conspiracy charged.

### III.

In essence, petitioners were tried upon the charge that they believe in and want to foist upon this country a different and to us a despicable form of authoritarian government in which voices criticizing the existing order are summarily silenced. I fear that the present type of prosecutions are more in line with the philosophy of authoritarian government than with that expressed by our First Amendment.

Doubtlessly, dictators have to stamp out causes and beliefs which they deem subversive to their evil regimes.

But governmental suppression of causes and beliefs seems to me to be the very antithesis of what our Constitution stands for. The choice expressed in the First Amendment in favor of free expression was made against a turbulent background by men such as Jefferson, Madison, and Mason—men who believed that loyalty to the provisions of this Amendment was the best way to assure a long life for this new nation and its Government. Unless there is complete freedom for expression of all ideas, whether we like them or not, concerning the way government should be run and who shall run it, I doubt if any views in the long run can be secured against the censor. The First Amendment provides the only kind of security system that can preserve a free government—one that leaves the way wide open for people to favor, discuss, advocate, or incite causes and doctrines however obnoxious and antagonistic such views may be to the rest of us.

Mr. Justice Clark, dissenting.

The petitioners, principal organizers and leaders of the Communist Party in California, have been convicted for a conspiracy covering the period 1940 to 1951. They were engaged in this conspiracy with the defendants in *Dennis* v. *United States,* 341 U. S. 494 (1951). The *Dennis* defendants, named as co-conspirators but not indicted with the defendants here, were convicted in New York under the former conspiracy provisions of the Smith Act, 54 Stat. 671, 18 U. S. C. (1946 ed.) § 11. They have served or are now serving prison terms as a result of their convictions.

The conspiracy charged here is the same as in *Dennis,* except that here it is geared to California conditions, and brought, for the period 1948 to 1951, under the general conspiracy statute, 18 U. S. C. § 371, rather than the old conspiracy section of the Smith Act. The indictment

charges petitioners with a conspiracy to violate two sections of the Smith Act, as recodified in 18 U. S. C. § 2385, by knowingly and wilfully (1) teaching and advocating the violent overthrow of the Government of the United States, and (2) organizing in California through the creation of groups, cells, schools, assemblies of persons, and the like, the Communist Party, a society which teaches or advocates violent overthrow of the Government.

The conspiracy includes the same group of defendants as in the *Dennis* case though petitioners here occupied a lower echelon in the party hierarchy. They, nevertheless, served in the same army and were engaged in the same mission. The convictions here were based upon evidence closely paralleling that adduced in *Dennis* and in *United States* v. *Flynn,* 216 F. 2d 354 (C. A. 2d Cir. 1954), both of which resulted in convictions. This Court laid down in *Dennis* the principles governing such prosecutions and they were closely adhered to here, although the nature of the two cases did not permit identical handling.

I would affirm the convictions. However, the Court has freed five of the convicted petitioners and ordered new trials for the remaining nine. As to the five, it says that the evidence is "clearly insufficient." I agree with the Court of Appeals, the District Court, and the jury that the evidence showed guilt beyond a reasonable doubt.[1] It paralleled that in *Dennis* and *Flynn* and was

---

[1] Petitioners Richmond, Connelly, Kusnitz, Steinberg, and Spector are set free.

Richmond at the time of his indictment had for many years been the editor-in-chief of the Daily People's World, the official organ of the Party on the West Coast. He had joined the Party in 1931 and received his indoctrination in Communist technique at the offices of the Daily Worker, the official Party paper on the East Coast. In 1937 he was chosen by the Party's Central Committee to be

equally as strong. In any event, this Court should not acquit anyone here. In its long history I find no case in which an acquittal has been ordered by this Court solely on the *facts*. It is somewhat late to start in now usurping the function of the jury, especially where new trials are to be held covering the same charges. It may be— although after today's opinion it is somewhat doubt- ful—that under the new theories announced by the Court

---

managing editor of the Daily People's World and was transferred to California. From 1946 through 1948 he regularly attended secret meetings of the state and county boards of the Party, admission to which was by identification from a special list of Party members prepared by the Party chairman or its security chief. Party strategy was mapped out at "very secret meetings" attended by Richmond and the core of the Party machinery, including at least seven of the peti- tioners here. Richmond served on a special committee to help develop "preconvention discussion" with petitioner Yates; he represented the state committee at the 1950 convention; he addressed many Party meetings preaching the "vanguard role" of the Party and the importance of the People's World in the Communist movement; and his articles in the paper urged the "Leninist and Marxist approach."

Connelly, a Party member since at least 1938, was the Los Angeles editor of the People's World. During the mobilization effort early in World War II he devoted his efforts to "building up sentiment against . . . the war effort" among steel, aircraft, and shipyard workers. He attended the same secret meetings attended by Richmond.

There can be no question that the proof sustained the charges against Richmond and Connelly in the conspiracy. Their newspaper was the conduit through which the Party announced its aims, policies, and decisions, sought its funds, and recruited its members. It is the height of naiveté to claim that the People's World does not publish appeals to its readers to follow Party doctrine in seeking the overthrow of the Government by force, but it is stark reality to conclude that such a publication provides an incomparable means of promoting the Party's aim of forcible seizure when the time is ripe.

Petitioner Spector has been active in the California Party since the early 1930's. He taught "Marxism-Leninism" in Party schools

for Smith Act prosecutions sufficient evidence might be available on remand. To say the least, the Government should have an opportunity to present its evidence under these changed conditions.

I cannot agree that half of the indictment against the remaining nine petitioners should be quashed as barred by the statute of limitations. I agree with my Brother Burton that the Court has incorrectly interpreted the

and was "division organizer" in Los Angeles County. He attended "underground meetings" with petitioners Lambert, Dobbs, Healy, Carlson, and Schneiderman. The witness Rosser testified that these meetings were "so hid that you couldn't get to them unless you were invited and taken there." In 1946 he "conducted classes" for Party members in Hollywood, and in 1947 as a member of a committee of three Party officials examined the witness Russell, a student in one of his classes, on charges of being a Party "police spy."

Petitioner Kusnitz, following an organizational indoctrination period in New York City, became a Party leader in California in 1946, served as "section organizer," and later as "organizational secretary" in Los Angeles. Her position was directly below that of the local chairman in Party hierarchy. She attended many secret meetings and was present at a Party meeting with petitioner Yates when Yates advocated the necessity of "Soviet support" and "Marxist-Leninist training" as a means of bringing about the Soviet "type of government . . . all over the world." She contributed articles to Communist publications and was very active in the "regrouping of . . . clubs into smaller units"; conducting a "six session leadership training seminar"; carrying on campaigns for subscriptions to the People's World; and leading the "Party Building drive" for the recruitment of members.

Petitioner Henry Steinberg, active in the Young Communist League, and associated with the Party since 1936, was the "educational director." He took part in the creation of the program for the Party's training schools in Los Angeles County. His "education department" sponsored several meetings, one honoring the 25th anniversary of the death of Lenin. He worked with petitioner Schneiderman, the Party Chairman in California, attended meetings regularly, was active in circulation drives for the People's World, and was the principal speaker at many meetings.

term "organize" as used in the Smith Act. The Court concludes that the plain words of the Act,[2] "Whoever organizes or *helps* or *attempts* to organize any society, group, or assembly of persons" (emphasis added) embodies only those "acts entering into the creation of a new organization." As applied to the Communist Party, the Court holds that it refers only to the reconstitution of the Party in 1945 and a part of the prosecution here is, therefore, barred by the three-year statute of limitations. This construction frustrates the purpose of the Congress for the Act was passed in 1940 primarily to curb the growing strength and activity of the Party.[3] Under such an interpretation all prosecution would have been barred at the very time of the adoption of the Act for the Party was formed in 1919. If the Congress had been concerned with the initial establishment of the Party it would not have used the words "helps or attempts," nor the phrase "group,

---

[2] 18 U. S. C. § 2385.

[3] Congressman McCormack's remarks on the floor of the House of Representatives on July 29, 1939, during the debate on the Smith Act reflect the underlying purpose behind that Act. He stated, *inter alia:*

"We all know that the Communist movement has as its ultimate objective the overthrow of government by force and violence or by any means, legal or illegal, or a combination of both. That testimony was indisputably produced before the special committee of which I was chairman, and came from the lips not of those who gave hearsay testimony, but of the actual official records of the Communist Party of the United States, presented to our committee by the executive secretary of the Communist Party and the leader of the Communist Party in the United States, Earl Browder. . . . Therefore, a Communist is one who intends knowingly or willfully to participate in any actions, legal or illegal, or a combination of both, that will bring about the ultimate overthrow of our Government. *He is the one we are aiming at . . . .*" (Emphasis added.) 84 Cong. Rec. 10454. See also Hearings before Subcommittee No. 3 of the House Committee on the Judiciary on H. R. 5138, 76th Cong., 1st Sess. 84.

or assembly of persons." It was concerned with the new Communist fronts, cells, schools, and other groups, as well as assemblies of persons, which were being created nearly every day under the aegis of the Party to carry on its purposes. This is what the indictment here charges and the proof shows beyond doubt was in fact done. The decision today prevents for all time any prosecution of Party members under this subparagraph of the Act.

While the holding of the Court requires a reversal of the case and a retrial, the Court very properly considers the instructions given by the trial judge. I do not agree with the conclusion of the Court regarding the instructions, but I am highly pleased to see that it disposes of this problem so that on the new trial instructions will be given that will at least meet the views of the Court. I have studied the section of the opinion concerning the instructions and frankly its "artillery of words" leaves me confused as to why the majority concludes that the charge as given was insufficient. I thought that *Dennis* merely held that a charge was sufficient where it requires a finding that "the Party advocates the theory that there is a duty and necessity to overthrow the Government by force and violence. . . . not as a prophetic insight or as a bit of . . . speculation, but as a program for winning adherents and as a policy to be translated into action" as soon as the circumstances permit. 341 U. S., at 546–547 (concurring opinion). I notice however that to the majority

> "The essence of the *Dennis* holding was that indoctrination of a group in preparation for future violent action, as well as exhortation to immediate action, by advocacy found to be directed to 'action for the accomplishment' of forcible overthrow, to violence 'as a rule or principle of action,' and employing 'language of incitement,' *id.,* at 511–512, is not constitutionally protected when the group is of sufficient

size and cohesiveness, is sufficiently oriented towards action, and other circumstances are such as reasonably to justify apprehension that action will occur."

I have read this statement over and over but do not seem to grasp its meaning for I see no resemblance between it and what the respected Chief Justice wrote in *Dennis,* nor do I find any such theory in the concurring opinions. As I see it, the trial judge charged in essence all that was required under the *Dennis* opinions, whether one takes the view of the Chief Justice or of those concurring in the judgment. Apparently what disturbs the Court now is that the trial judge here did not give the *Dennis* charge although both the prosecution and the defense asked that it be given. Since he refused to grant these requests I suppose the majority feels that there must be some difference between the two charges, else the one that was given in *Dennis* would have been followed here. While there may be some distinctions between the charges, as I view them they are without material difference. I find, as the majority intimates, that the distinctions are too "subtle and difficult to grasp."

However, in view of the fact that the case must be retried, regardless of the disposition made here on the charges, I see no reason to engage in what becomes nothing more than an exercise in semantics with the majority about this phase of the case. Certainly if I had been sitting at the trial I would have given the *Dennis* charge, not because I consider it any more correct, but simply because it had the stamp of approval of this Court. Perhaps this approach is too practical. But I am sure the trial judge realizes now that practicality often pays.

I should perhaps add that I am in agreement with the Court in its holding that petitioner Schneiderman can find no aid from the doctrine of collateral estoppel.