## State v. Young
### [Cite as 2 AOA 97]

Case No. 11330
Montgomery County, (2nd)
Decided April 10, 1990

R.C.2909.02
R.C.2923.01

*Lee C. Falke, Prosecuting Attorney for
Montgomery County, Ohio, By: Ted E. Millspaugh,
Assistant Prosecuting Attorney, Appellate Division,
Suite 315, 41 N. Perry Street, Dayton, Ohio 45402,
Attorney for Plaintiff-Appellee.*

*G. Gary Tyack, 7100 North High Street, Suite 209,
Worthington, Ohio 43085, Attorney for Defendant-
Appellant.*

*Per Curiam.*

Appellant, Rick Young, appeals from his
conviction after a jury trial in the Montgomery
County Common Pleas Court of conspiracy to
commit aggravated arson. Appellant contends the
trial court erred in overruling his motion for
judgment of acquittal made at the conclusion of
the state's case, the court erred in admitting into
evidence certain statements made by James
Boggs, the court erred in admitting into evidence
a tape recording of Douglas Willoughby's
discussions with the appellant, the court erred
in finding Willoughby competent to testify, and
in refusing to give a requested instruction.

In February 1988, Dayton Police Officer
James Cooper received a phone call from James
Boggs who stated that a Douglas Willoughby had
contacted him to burn down three houses. Based
upon Boggs' statements to Cooper and other
members of the Regional Fire Investigation
Team, the police requested Boggs to wear a body
microphone while police monitored his
conversations with Willoughby.

On February 15, 1988, Boggs met
Willoughby in the parking lot of the Crossroads
Club in Harrison Township under police
surveillance. Willoughby advised Boggs he would
show him the locations where the fires were to
be set. Willoughby drove Boggs to two locations
in Clark County, the office of Dr. David Polen,
a chiropractor, and the residence of George
Hammann, Polen's brother-in-law, and later to
the residences of attorney Douglas Bench and a
Detective Hammann in Dayton.

Detective John Coffman of the Montgomery
County Sheriff's office testified over objection of
appellant's counsel that he overheard Willoughby
tell Boggs at Dr. Polen's office how "his boss
wanted it done." "If you want to be paid, it has
to be done something similar to this." (Tr. 251).

Coffman testified that when Boggs and
Willoughby arrived at the Hammann residence,
Willoughby gave Boggs in depth instructions on
how to gain entry and how to start the fire with
gasoline.

When they left the Hammann house,
Coffman stated that Willoughby identified his
employer as the appellant. He said appellant had
been involved in money problems with the targets
of the arsons and appellant "was seeking to get
even with these people." (Tr. 251).

Police then followed Boggs and Willoughby
back to the Crossroads Club where they
monitored Boggs' conversations with Willoughby
as Willoughby dictated the directions to each
arson location for Boggs. Coffman heard
Willoughby tell Boggs that Boggs would be paid
$500 by appellant. (Tr. 253).

When Boggs and Willoughby departed
company, Coffman had Willoughby arrested for
conspiracy to commit aggravated arson. Coffman
located several pieces of paper inside
Willoughby's car on the driver's seat between the
driver and passenger. Coffman identified State's
Exhibit 13 which was a piece of paper he removed
from Willoughby's vehicle with the addresses of
Polen, Hammann, and Bench contained thereon.
He also identified State's Exhibit 14, a legal size
piece of paper containing more detailed
descriptions of Dr. Polen's office and the
Hammann's residences.

Willoughby admitted his involvement in the
conspiracy to Coffman and agreed to wear a body
microphone while police monitored his
conversations with the appellant. The state
introduced a tape of Willoughby's conversations
with the appellant. (State's Exhibit 26). Much of
the tape contains rambling and irrelevant

conversation laced with obscenities by the appellant. In the tape appellant admits to burning Dr. Polen's trailer by using flares. (Tr. 36-37, Exhibit 26). Appellant informs Willoughby that the use of flares caused an explosion which surprised him. He reassures Willoughby that he should not be afraid of using the flares because he can expect the explosion and protect himself. (Tr. 38-38, Exhibit 26). Later appellant implores Willoughby to perform the arson properly. Appellant asks Willoughby if he has the gasoline and flares. He instructs him not to leave any physical evidence at the scene of the fire. Appellant assures Willoughby that he is better off without the help of anyone and to be careful. (Tr. 64-70, Exhibit 26).

After reviewing the tape, the police obtained a search warrant and searched the appellant's home. Police found two gasoline cans inside an automobile, safety caps straps for flares, two flares, surgical mask and gloves, and a copy of "Anarchist Cookbook." The surgical gloves contained evidence of gasoline.

Evidence at trial revealed that appellant was hired in 1982 by Dr. Polen as a business manager to run Polen's chiropractic offices. Appellant set up a corporation in which the appellant owned half of the stock. In December 1983 appellant was shot in the head and missed work for some time. In 1984, after appellant returned to work Polen began discovering large inexplicable withdrawals from the business accounts. Eventually, the business was placed in receivership and appellant was terminated.

Shortly thereafter Polen and the appellant became embroiled in arguments over access to the corporation's property. Polen testified that appellant remarked at the time that if he lost everything he would see to it that Dr. Polen lost everything. (Tr. 82). Appellant informed Officer George Hammann, Polen's brother-in-law that he would put Polen out of business.

On August 30, 1987 Polen's office in Medway was burned down. Polen was forced to place a trailer on the house site to use as temporary office space. On December 30, 1987 the trailer was burned down. One week later, Polen discovered a fire in his new office building when someone had attempted to pour gasoline on the roof and lighted flares in the roof spouting.

In 1984 attorney Douglas Bench represented appellant in a personal injury suit and when appellant went into bankruptcy, the suit was settled with permission of the bankruptcy trustee. Appellant was angry about the settlement and told Bench "he had lost his house and Bench wouldn't like it if he lost his house."

Douglas Willoughby testified he was a long time associate and friend of the appellant. He said in June or July 1986 appellant offered him $1000 to burn down Dr. Polen's office because Polen had stolen money out their corporation. He said appellant advised him to use gas cans and flares. In late 1987 or 1988, appellant informed Willoughby he wanted three houses burned and he gave Willoughby a piece of paper with the houses listed on it; to wit: Polen's, Hammann's, and Bench's houses; see Exhibit 13. Appellant told Willoughby he could get someone to do it for him or with him. (Tr. 188). This led to Willoughby asking Boggs to join the conspiracy.

R.C. 2923.01(A) provides in pertinent part: "No person, with purpose to commit (aggravated arson) shall do either of the following:

(1) with another person or persons, plan or aid in planning the commission of any such offense.

(2) agree with another person or persons that one or both of them will engage in conduct that facilitates the commission of such offense."

R.C. 2923.01(B) provides:

"(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by him or a person with whom he conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of such character as to manifest a purpose on the part of the actor that the object of the conspiracy should be completed."

In State v. Marian (1980), 62 Ohio St. 2d 250, the Ohio Supreme Court held that a person is guilty of conspiracy under R.C. 2923.01 even though the other person feigns agreement and at no time intends to go through with the plan. Chief Justice Celebrezze noted at pages 254 and 255 of the Court's opinion:

"The acts and intent of the unilateral conspirator are identical to those of the conspirator who is part of a group where an actual meeting of the minds exists. The unilateral conspirator's culpability is the same as the participant in a more traditional conspiracy. This is in contrast to the person guilty of an attempt; he has not acted in the same manner as the man actually guilty of the crime. Consequently, once it is decided that participation in unlawful group conduct is the proper subject of a criminal offense even in the absence of a meeting of the minds, it becomes proper to make such participation a

conspiracy even though it may be inchoate in nature. The unilateral approach is properly a part of our criminal justice system.

This is particularly true when the legislature has recognized and dealt with the inchoate nature of unilateral conspiracies. *R.C. 2923.01(B) requires that there be a substantial overt act, insuring that purely a state of mind is not punishable.* R.C. 2923.01(G) merges the conspiracy offense, due to its inchoate nature, into the substantive offenses which are the object of the conspiracy. In addition, the legislature has not provided a separate provision for the highly inchoate solicitation offense."

In *State* v. *Papp* (1980), 68 Ohio App. 2d 21, the Franklin County Court of Appeals held that as used in R.C. 2923.01(B), the phrase "over act" means an open act, done outwardly, without attempt at concealment, and performed pursuant to and manifesting a specific intent or design.

Some commentators, and even some judges, have suggested that the purposes of the overt act requirement - demonstration of clear resolve and intent to commit the crime - would best be met by making the overt act more substantial. Making the requirement the equivalent of the attempted crime was suggested for the proposed Revised Federal Criminal Code see Swartz, *Report of the National Commission on the Reform of Federal Laws* (1971). This approach gained little support and no court has adopted it.

Some states provide the overt act requirement is met "by any step in preparation," the slightest overt act, an act, or just simply an "overt act." These requirements are minimal. Klein, *Conspiracy - The Prosecutor's Darling,* 24 Brooklyn L. Rev. 1,5 (1957). A few state legislatures adopted overt act requirements which involve more "substantial" acts than the other formulations of the requirement. *See,* R.C. 2923.01(B).

Since Justice Harlen's opinion in *Yates* v. *United States* (1957), 354 U.S. 298, overt act provisions have been supported by a dual justification, the occurrence of such an act assures that a credible threat of an actual substantive crime exists, and also guards against the unwarranted indictment of innocent persons under the conspiracy rubric. Note, *Conspiracy & Statutory Reform Since the Model Penal Code,* 75 Columbia L. Rev. 1122. The function of the overt act in a conspiracy prosecution is simply to manifest "that the conspiracy is at work ... and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence." *Yates,* at 334.

Evidence is sufficient to support a conviction if a reasonable person could find that each element of the crime had been proved beyond a reasonable doubt. *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 26.

There was evidence presented that appellant entered into an agreement with Willoughby whereby Willoughby and a companion would burn three properties. There was evidence that appellant gave Willoughby a piece of paper with descriptions and addresses of the targeted properties. There is evidence that Willoughby enlisted the aid of Boggs and Willoughby transported Boggs to examine the properties more closely. There was sufficient evidence in the record to withstand a Rule 29 motion. The first assignment is overruled.

In appellant's second assignment, he contends the trial court erred in admitting into evidence the statements of James Boggs. We agree with appellant that the trial court erred in admitting the statements of Boggs to police officers. In light of the testimony of Willoughby and the taped statements of the appellant, the admission of these statements was harmless beyond a reasonable doubt. The second assignment is overruled.

In his third assignment of error, the appellant contends the trial court erred in admitting into evidence the tape record of Willoughby's discussions with appellant after Willoughby's arrest. Appellant contends the probative value of the taped conversations was outweighed by its danger for unfair prejudice, confusion of issues, and its propensity to mislead the jury.

We agree with the appellant that the bulk of the taped conversation consists of irrelevant conversation laced with profanity. The tape does contain relevant conversation between Willoughby and the appellant. Although counsel objected to the admission of the tape at trial, the objection was not specific. Indeed counsel later withdrew his objection that some portions of the taped conversation were inappropriate. (See, Tr. 310). The admission of evidence is committed to the sound discretion of the trial court. *State* v. *Hymore* (1967), 9 Ohio St. 2d 122. This assignment is also overruled.

In appellant's fourth assignment, he contends that the trial court erred in finding Douglas Willoughby competent to testify. During voir dire examination, Willoughby acknowledged that he had been diagnosed in early 1987 as suffering from a bipolar disorder (manic depressive). He stated he was prescribed lithium carbonate and

haloperidol for his emotional problems, but he was not taking the haloperidol in the period of January to March 1988. He said he was hospitalized in March and April 1988 for psychotic episodes. He stated he becomes disoriented and hears voices during the psychotic episodes. He said he was hearing voices in the time frame of January to March 1988. He said his last disorientation occurred in April 1988 and he was presently under the treatment of a physician.

He stated he was taking his medication properly and he understood why he had been subpoenaed to testify in the matter before the court.

The trial court found that Willoughby was quite lucid during the voir dire and was aware of his obligations as a witness. The court also found that Willoughby's memory was quite acute, and that the testimony concerning the witness' emotional problems "goes more to the weight" of his testimony than its admissibility. (Tr. 160).

A trial judge, being in the best position to view and hear a witness is to be given wide discretion in determining that a witness is competent to testify. *State v. Bradley* (1989), 42 Ohio St. 3d 136. Evid. R. 601 states in pertinent part that "Every person is competent to be a witness except those of unsound mind who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." In *State v. Wildman* (1945), 145 Ohio St. 379, the Ohio Supreme Court stated at syllabus three: "A person, who is able to correctly state matters which have come within his perception with respect to issues involved and appreciates and understands the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind."

A witness is presumed competent and the appellant failed to demonstrate that Willoughby was not competent. Willoughby's trial testimony corroborates his competency. The tape of his conversation with the appellant corroborates that the appellant had enlisted Willoughby's assistance in the planned arsons. We see no abuse of discretion in the trial court's competency ruling. The assignment is overruled.

In his fifth assignment of error, appellant contends the trial court erred in refusing to charge the jury on the defense of insanity in the manner requested by the appellant. Appellant requested that the court instruct the jury in the following manner:

"To establish the defense of insanity, the accused must prove by a preponderance of the evidence that at the time of the offense, as a result of a mental disease or defect, he lacked *substantial* capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." (Court's Ex. 2).

The Ohio Supreme Court rejected this so called "diminished capacity" instruction in *State v. Staten* (1969), 18 Ohio St. 2d 13 at 20, acknowledging that the Ohio insanity rule is broader than McNaghten.

In *State v. Wilcox* (1982), 70 Ohio St. 2d 182, the Ohio Supreme Court held that the partial defense of diminished capacity is not recognized in Ohio and a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for the particular crime or degree of crime. Justice Sweeney wrote:

"The ameliorative argument loses much of its force, however, in jurisdictions that have abandoned or expanded upon the narrow M'Naghten standard. The test for insanity in Ohio is set forth in *State v. Staten* (1969), 18 Ohio St. 2d 13, paragraph one of the syllabus, as follows:

"One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law. * * *'" (Citations omitted).

While this standard is arguably less expansive than that espoused by the drafters of the Model Penal Code, see Section 4.01, it is considerably more flexible than the M'Naghten rule. The record in the case at bar, which is replete with expert testimony going to the question of appellee's sanity, illustrates the relative liberality of Ohio's insanity rule. Thus we see no reason to fashion a halfway measure, e.g., diminished capacity, when an accused may present a meaningful insanity defense in a proper case. Cf. Lewin, *supra*, at page 1091 ("courts have used * * * [liberal insanity tests] as a reason to reject partial responsibility")."

The instruction requested by the appellant is that espoused by the drafters of the Model Penal Code. With a limited number of exceptions, jurisdictions drawing from the Model Penal Code have followed it in using the word "substantial" to indicate the necessary impairment of capacity. It is doubtful if any other single term that does

not implicitly require an unrealistic total lack of capacity can better catch the notion of a very considerable incapacity. *See* Comment to Section 4.01 Model Penal Code, The American Law Institute (1985), and Judge Bazelon's dissent in *United States* v. *Brawner*, 471 F. 2d 969, 1033-34 (D.C. Cir. 1972) the case in which the Court of Appeals abandoned the Durham Rule and accepted the Model Penal Code formulation.

We are nonetheless required to follow the precedent as announced by the Ohio Supreme Court. The assignment is overruled.

*Judgment affirmed.*

WOLFF, P.J., BROGAN, J., and FAIN, J., concur.