**UNITED STATES of America, Appellee,**

v.

**Robert GARCIA, Jane Lee Garcia, Ralph Vallone, Jr., Defendants–Appellants.**

Nos. 576, 577, 578, Dockets 92–1370(L), 92–1371, 92–1401.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1993.

Decided April 22, 1993.

**410**

Barry A. Bohrer, New York City (Joel M. Cohen, of counsel), for defendants-appellants Robert Garcia and Jane Lee Garcia.

Alexander E. Eisemann, New York City (Lawrence S. Goldman, of counsel), for defendant-appellant Ralph Vallone, Jr.

Michele Hirshman, Asst. U.S. Atty., S.D.N.Y., New York City (Roger S. Hayes, Acting U.S. Atty., Paul G. Gardephe, Asst. U.S. Atty., of counsel), for appellee United States of America.

Before: PRATT, FRIEDMAN,* and MAHONEY, Circuit Judges.

FRIEDMAN, Circuit Judge:

Former New York Congressman Robert Garcia, his wife, Jane Lee Garcia, and Ralph Vallone, Jr., appeal their jury convictions for, respectively, (1) extortion under color of official right, (2) aiding and abetting extortion and conspiracy to commit extortion, and (3) aiding and abetting extortion. We hold that the district court improperly charged the jury on extortion, 774 F.Supp. 848, and, therefore, reverse the convictions and remand for a new trial.

I

A. Mr. Garcia was elected to Congress in 1978 to represent the Bronx district where the Wedtech Corporation, a defense contractor, was located. Beginning early in his first term, Garcia maintained a close relationship with Wedtech, aiding it in obtaining financing from the Economic Development Administration and a loan from Citibank in 1979. In 1981, Garcia helped Wedtech obtain a loan from the Small Business Administration and funding from Urban Development Action grants. That same year, John Mariotta, a top Wedtech officer, and his wife Jennie, contributed $4000 to Garcia's campaign. Wedtech's other officers, their spouses, and company employees also made numerous contributions to Garcia's campaign fund.

1. *The $86,000 "Retainer" Payments.* In May 1984, Garcia invited Mario Moreno, a Wedtech officer who was the government's primary witness at trial, to dinner at Lelo's Restaurant in Manhattan, where Mrs. Garcia also was present. After Moreno described the work Wedtech was doing, the problems it had with its contract to build pontoons for the Navy and its interest in obtaining a contract to produce mail containers for the Postal Service, Garcia told Moreno

> that he had already served for a few years in Congress and that he belong [sic] to the Banking Committee, the Postal Service Committee, and that he was getting very interested in international relations, and that he was also a member of the Hispanic caucus in Congress ... and that the more

* Daniel M. Friedman, of the Court of Appeals for the Federal Circuit, sitting by designation.

times you are elected to the Congress you become a more powerful person.

Garcia suggested that Wedtech hire his wife as a public relations consultant. Moreno told the Garcias:

"that's crazy because you are the congressman for this district, and I don't think that that is ... correct. And—and I don't think that we can do that. And, besides, what is she going to do at the company? We don't need any public relations person there because the company is involved in defense work, and there is no need for such a thing."

Mrs. Garcia responded:

"We could do a lot of things for you. We can set up those appointments to go and see [Secretary of the Navy] Lehman about the Navy contracts. We can also—we are very close friends of [Postmaster General] Bolger. We know him, and we can set up an appointment with him to see about those contracts."

Furthermore, she explained that she had " 'a friend in Puerto Rico [Vallone] that is like a brother to me. He is very close. We grew up together. And I think he could serve as intermediary for these payments.' "

Several days later, Moreno and the other Wedtech officers decided to make the payments to Mrs. Garcia through Vallone, a lawyer in Puerto Rico

because of the potential of the Postal Services contracts, that we knew that if those payments were not made, and even if the Congressman wanted to help us like he had done in the past, we realized and I personally told [the other officers] that his wife would not let him do any additional favor for Wedtech, and in a sense, we could kiss the Postal Services contracts, potential contracts, good-bye.

About six weeks later, Moreno told Mrs. Garcia that Wedtech had agreed to make the payments to her through Vallone. Soon after, Vallone called Moreno and

[h]e told me that Jane had spoken to him about the transaction, and that he had agreed to do that for her only because she was like a sister to him, that he didn't do that for anybody else.

Vallone and Moreno arranged for Vallone's law firm to bill Wedtech.

From August 1984 through May 1986, Wedtech paid $86,000 in monthly "retainers" of $4100 to Vallone, who performed no services for Wedtech. Vallone, in turn, for his law firm, paid $76,000 in alleged consulting fees to Mrs. Garcia's business, Leesonia Enterprises.

After the payments began, Garcia spoke with the Postmaster General about contracting with Wedtech to provide postal containers. Frank Hansen, the general manager of the Postal Service's Office of Procurement, testified that Postmaster General Bolger called him in August 1984 and asked that Hansen "check out" Wedtech as a source of metal-fabricated products. In April 1985, the Postal Service contracted with Wedtech to build mail containers. During this time, Moreno learned that the House Small Business Committee· was investigating Wedtech and Moreno requested that Garcia intercede on their behalf.

In 1985, Wedtech experienced a "severe cash problem," and stopped making payments to the Garcias between February and August. Both Mrs. Garcia and Vallone called Moreno to inquire why the payments were not being made, and Moreno explained the financial difficulties the corporation was undergoing. Nonetheless, at Garcia's request, Wedtech officer John Mariotta, in March 1985, donated $65,000 from Wedtech's "slush fund" to the church run by Garcia's sister.

Wedtech's economic situation remained precarious and in late August or early September, Moreno asked Garcia, who was a member of the House Banking Committee, to intercede on Wedtech's behalf with three banks so the company could get needed financing. In September, at Garcia's request, Moreno met with the Congressman for lunch, and gave him a check for Vallone for $12,300 for past due "retainer" fees, and told him "that very soon we would bring the account up to date." Moreno and another Wedtech official

felt that it was very important to bring them up to date so that—so that all the activities where we could use him could

continue in the best way, that means the contracts with the Post Office, the [contract to build] ferries in Puerto Rico, and primarily the problems with the banks at that time.

At lunch, Garcia told Moreno that he had contacted the head of one of the banks and was working on getting in touch with the other two. They also discussed the other projects with which the Congressman was assisting Wedtech.

Moreno, Mariotta, and their spouses traveled in mid-September to Puerto Rico to meet with officials there about contracts to build ferries. The Garcias also were in Puerto Rico at the time, and Mrs. Garcia arranged for Moreno, Mariotta, and the Congressman to meet with Puerto Rico's governor. The Governor agreed to help Wedtech get the contracts. The next day Mariotta gave Mrs. Garcia a diamond and emerald necklace on behalf of Wedtech. On the trip back to New York, Mariotta told Moreno that Wedtech had " 'better bring [the] account [with Vallone] up to date as soon as we get to New York.' "

Wedtech paid Vallone $20,500 in October, and $8,200 in November. In December, Mrs. Garcia called Moreno and told him "that she had a financial need, very urgent financial need at that point, and she told me that she wanted to get paid for the month [sic] of November and December." Moreno authorized the payment of $8,200 to Vallone. In March, at a dinner in honor of the Congressman, Moreno gave Garcia checks for Vallone for the past three monthly payments. This was the final payment Wedtech made to Vallone.

2. *The $20,000 Loan.* In August 1985, at a meeting that Garcia urgently requested, Garcia told Moreno that he needed to borrow $20,000 from Moreno. Moreno informed the Congressman that "my financial situation was not that good at that time, but that I was going to see what I could do." Garcia assured him that it would be "a straightforward loan, and that it would include interest."

Moreno went to Wedtech and had a check drawn on the "slush fund" for the fifteen percent of the fund that was due him after

"illegal expenses had been paid out of the . . . account," and for an additional $20,000 to cover the check he was about to write to Garcia. At Garcia's direction, Moreno made the check out to the Congressman's sister, Reverend Aimee Cortese, with the understanding that Garcia "didn't want his name to appear along with [mine]" on the check. That same day, Mrs. Cortese made out a check for $20,000 to Mrs. Garcia. Moreno made the loan "[b]ecause I thought that if I didn't give that loan, he was not going to—to continue doing things for the company, especially since we had not paid him the regular retainer for the previous few months."

In February 1986, Garcia invited Moreno to his home and told Moreno that he was going to repay the $20,000 loan, although without interest. He asked Moreno, however, not to take the money back but instead to donate it to the church run by Garcia's sister. Moreno declined to do so and received a check for the amount of the loan drawn on Mrs. Cortese's bank account.

B. Following the return of a seven-count indictment in November 1988 against the Garcias and Vallone, a jury convicted the Garcias on three counts charging violations of the Hobbs Act, 18 U.S.C. § 1951 (1988). This court, however, reversed the convictions and remanded, on the ground that the evidence did not support one of the two alternative theories upon which the case was submitted to the jury, and that the jury convictions therefore could have been based upon that unsupported theory. *United States v. Garcia,* 907 F.2d 380 (2d Cir.1990).

On the retrial, the jury convicted Garcia of extortion of the $20,000 loan, in violation of 18 U.S.C. § 1951, Mrs. Garcia and Vallone of aiding and abetting extortion of $76,000, in violation of 18 U.S.C. § 2, and Mrs. Garcia of conspiracy to commit extortion of the $76,000, in violation of 18 U.S.C. § 371. At the defendants' request and over the government's objection, the district court then discharged the jury and thereby precluded it from continuing its deliberations on the remaining counts against each defendant.

## II

The provision of the Hobbs Act, under which Garcia was convicted, makes criminal,

among other things, conduct affecting interstate commerce "by extortion," and defines "extortion" to mean

> the obtaining of property from another, with his consent, induced ... under color of official right.

18 U.S.C. § 1951(b)(2) (1988).

A. When the case was retried, the governing law in this circuit on the requirements for proving extortion under color of official right was that enunciated in this court's *en banc* decision in *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984). There, we held (1) that "the government must show that the public official *induced* the benefits received," *id.* at 688 (footnote omitted), but (2) that "the government is not required to prove that the public official demanded or directly solicited the benefits received, or that he offered a specific *quid pro quo* in exchange for the benefits." *Id.* at 688–89.

The district court charged the jury in accordance with these standards. It instructed that the government was required to prove

> That the defendants attempted to obtain or did obtain property from another with the other's consent.

> That the defendants induced that consent under color of official right.

> That interstate commerce was actually or potentially in any way or degree obstructed, delayed or affected.

The court explained the inducement element as follows:

> To find that the defendants obtained monies or loans under color of official right you must find that the defendants in some way caused the payment of monies or loans to Robert Garcia or another in connection with Robert Garcia's public office. The government may prove that the defendants used any one of the three forms of inducement.

> First, if a defendant sought or solicited, no matter how subtly, the payment of monies or benefits from representatives of Wedtech, in connection with Robert Garcia's official duties or otherwise communicated that he expected to receive money or benefits, he induced the payments for purpose of the statute; or

> Second, if a defendant conferred or offered to confer some benefit, or refrained or offered to refrain from some official act, in exchange for the payment of monies or benefits from representatives of Wedtech, then he induced the payment of monies; or

> Third, if the defendant repeatedly accepted monies or benefits from representatives of Wedtech, and if the amount of money or the benefits accepted could reasonably have affected the defendant's exercise of his duties, then you may find that the defendant induced the payment of monies. However, the mere acceptance by the defendants of monies from representatives of Wedtech that could not reasonably be expected to affect the exercise of Robert Garcia's duties, without more, does not amount to inducement under the statute.

The court declined to give the Garcias' proposed instructions that to convict the jury must find "that the defendant obtained [the property of another] with the consent of the giver, but that this property was obtained in exchange for his or her promise of action or inaction under color of official right," and that

> In order to find extortion under color of official right, you must find that the public official in some way induced or caused the payment of monies or property in exchange for his promise of official action or inaction.

 . . . . .

> ... Extortion under color of official right is committed when a public official promises wrongful use of his office in exchange for money not due him or his office. Thus mere acceptance of monies is not sufficient. Nor is it sufficient that a public official receives money knowing that it was given with the expectation of a benefit on account of his office. The government must prove the public official induced the payment of the benefit through the misuse of his office, by promising to do something under color of his public office in exchange for that benefit.

B. Seven months after the retrial in this case, the Supreme Court in *Evans v. United States*, —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), rejecting our decision in

*O'Grady,* held that "an affirmative act of inducement by a public official, such as a demand, is [not] an element of the offense of extortion 'under color of official right' prohibited by the Hobbs Act." *Id.* at ——, 112 S.Ct. at 1883. "We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at ——, 112 S.Ct. at 1889 (footnote omitted).

The Court referred to the "*quid pro quo* requirement" of *McCormick v. United States,* —— U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), which it held the district court's instructions in *Evans* "satisfie[d]." *Evans,* —— U.S. ——, 112 S.Ct. at 1889. In *McCormick,* the Court held that, because the making of campaign contributions was a traditional practice in American politics, campaign contributions could constitute extortion under color of official right in violation of the Hobbs Act "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *McCormick,* —— U.S. ——, 111 S.Ct. at 1816. The Court did "not decide whether a *quid pro quo* requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* at ——, n. 10, 111 S.Ct. at 1817, n. 10.

■ Our determination of the correctness of the jury instructions is based upon the law as it exists on the date of our decision, not as it was on the date of the instructions. *See George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1536 (2d Cir.) ("[O]n appeal, we must apply the law as it exists as of the date of our decision."), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992); *Mrs. W., Mrs. B., & Conn. Legal Servs. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987) (It is "the duty of courts to decide the issues in a case consistent with the directives of a statute enacted subsequent to the judgment appealed from."); *Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 248 (2d Cir.1979) (Where "before a case in a district court has

proceeded to final judgment, a decision of the Supreme Court demonstrates that a ruling on which the judgment would depend was in error, no principle of the 'law of the case' would warrant a failure on our part to correct the ruling.").

The district court's failure to give an instruction on *quid pro quo* was error. The court declined to do so because it viewed that requirement as enunciated in *McCormick* as limited to cases where the alleged extortion under color of official right involved campaign contributions. *United States v. Garcia,* 774 F.Supp. 848, 849 (S.D.N.Y.1991). Although the *McCormick* Court had ruled that extortion under color of official right in circumstances involving campaign contributions occurs "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," —— U.S. at ——, 111 S.Ct. at 1816, *Evans* modified this standard in non-campaign contribution cases by requiring that the government show only "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." —— U.S. at ——, 112 S.Ct. at 1889 (footnote omitted).

The district court did not rest its refusal to give the Garcias' proposed instruction, as it properly could have done, on the fact that the proposed instruction required the government to prove that Garcia received the money in return for an express promise. As Justice Kennedy pointed out in his concurring opinion in *Evans:* "The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it be so and the payor so interprets it." *Id.* at ——, 112 S.Ct. at 1892.

Although the district court's instruction that the government was required to prove inducement turned out to have been unnecessary, it did not prejudice, but instead aided, the defendants, since it imposed upon the government an additional burden of proof. The district court, however, failed to give the

separate instruction on the *quid pro quo* requirement that *Evans* mandates. The only remaining question, therefore, is whether the court's instructions on inducement sufficiently incorporated the substance of the *quid pro quo* requirement that the jury was informed that to convict it had to find "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at ——, 112 S.Ct. at 1889 (footnote omitted).

 As noted, the court instructed the jury that the "government may prove that the defendants used any one of the three forms of inducement." Only the second of these forms required the government to show that Garcia accepted money "in exchange for" an official act—a standard that satisfied the *quid pro quo* requirement of *Evans*. Neither the first nor the third possible forms satisfied the standard. The first form required the government to show only that Garcia solicited the payment of money "in connection with Robert Garcia's official duties." The third form permitted the jury to find inducement "if the defendant repeatedly accepted monies or benefits from representatives of Wedtech, and if the amount of money or the benefits accepted could reasonably have affected the defendant's exercise of his duties." This standard was sanctioned in *O'Grady*. *See* 742 F.2d at 694–95 (concurring opinions of Judge Pierce and Judge Newman).

Although no explicit agreement between Wedtech and Garcia need have been shown, the government must have shown that Garcia received the payment "knowing that [it] was made in return for official acts." *Evans*, —— U.S. at ——, 112 S.Ct. at 1889 (footnote omitted). Thus, it was not enough for the jury to have concluded that Garcia's acceptance of money was "in connection with [his] official duties" or "reasonably" could have "affected" the performance of his official duties. The jury was required to find that Garcia understood that the payment was made in return for performance of those duties.

We thus have a case in which the jury was given three disjunctive bases for conviction, one of which was legally sufficient and two of which were legally insufficient. We cannot tell the basis upon which the jury based its conviction of Garcia.

C. In *Griffin v. United States*, —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the Supreme Court held that where a jury convicted a defendant on a double object conspiracy charge, the court of appeals properly affirmed a general guilty verdict where the evidence was sufficient to establish one of those objectives, but insufficient to establish the other. The Court followed its earlier decision in *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), which, according to *Griffin*,

> involved a claim that the evidence was insufficient to support a general guilty verdict under a one-count indictment charging the defendant with knowingly purchasing, possessing, dispensing, and distributing heroin not in or from the original stamped package, in violation of 26 U.S.C. § 4704(a) (1964 ed.). We held that the conviction would have to be sustained if there was sufficient evidence of distribution *alone*. We set forth as the prevailing rule: "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id.*, at 420, 90 S.Ct. at 654.

—— U.S. at ——, 112 S.Ct. at 472–73.

The Court distinguished *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), in which, *Griffin* stated, the Court had held that where one of two objects of a conspiracy charge was "insufficient in law," —— U.S. at ——, 112 S.Ct. at 470, "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* (quoting *Yates*). The Court in *Griffin* refused to extend *Yates* to "set aside a general verdict because one of the possible bases of conviction was neither unconstitutional as in *Stromberg* [*v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)], nor even illegal as in *Yates*, but merely unsupported by sufficient evidence," *id.* —— U.S. at ——,

112 S.Ct. at 472,—a result which, *Griffin* concluded, would be contrary to *Turner*. *Id.*

■ Thus, the teaching of *Griffin* is that when disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, appeals based on evidentiary deficiencies must be treated differently than those based on legal deficiencies. If the challenge is evidentiary, as long as there was sufficient evidence to support one of the theories presented, then the verdict should be affirmed. However, if the challenge is legal and any of the theories was legally insufficient, then the verdict must be reversed.

In the present case, we have held that although one of the three theories upon which the case was submitted to the jury was legally sufficient, the other two theories were legally insufficient. Since Garcia's conviction may have been based upon one of those two theories, which would have been legally insufficient because they did not require the jury to find the *quid pro quo* that under *Evans* is a necessary element of the crime of extortion under color of official right, it follows that Garcia's conviction for that crime cannot stand.

### III

■ A. Mrs. Garcia and Vallone were both convicted of aiding and abetting extortion under color of official right in connection with Wedtech's payments through Vallone of the $76,000 retainer fees to Mrs. Garcia. Because the district court dismissed the jury after it returned its preliminary verdict, the jury did not determine Mr. Garcia's guilt or innocence under the substantive extortion count relating to those payments. The court charged the jury, however, that to convict as an aider and abetter, the jury could find

> a defendant guilty if you find beyond a reasonable doubt that the government has proved that Robert Garcia committed the crime of extortion under color of official right and that the defendant you are considering aided and abetted him in its commission.

The jury verdict that Mrs. Garcia and Vallone aided and abetted the extortion of $76,000 thus necessarily must have rested on a finding that Garcia committed that substantive offense. That finding of Garcia's substantive violation, however, is subject to the same fatal flaw that led us to reverse Garcia's extortion conviction based upon the $20,000 loan: it may have rested upon the erroneous first or third grounds specified in the inducement instruction under which the jury could have convicted without finding the existence of a *quid pro quo* for the payments. For that reason, therefore, we hold that the aiding and abetting convictions of Mrs. Garcia and Vallone must be reversed.

B. The same conclusion follows with respect to Mrs. Garcia's conviction for conspiring to commit extortion of the $76,000 payments. The court told the jury that it would "define the crime of extortion under the color of official right in more detail below," where it gave the instruction we have held to be defective. The court continued: "It is sufficient if you find that the conspirators agreed, tacitly or impliedly, to either one of the objectives stated in paragraphs 11 or 12 of the indictment." Those two paragraphs charge the extortion of the $76,000 payments and the $20,000 loan. Under those instructions, the jury may have convicted Mrs. Garcia of conspiracy to extort the $76,000 on the basis of conduct by Garcia that did not involve any *quid pro quo*.

### IV

In sum, the defective jury instructions require the reversal of the convictions of Garcia, Mrs. Garcia and Vallone, and a remand of the case to the district court. As noted, during the retrial, after the jury returned verdicts of guilty on three of the seven counts in the indictment, the other counts were dismissed. If the government so elects, the defendants can be retried on those counts as well.

The convictions of Garcia, Mrs. Garcia and Vallone are reversed, and the case is remanded to the district court for a new trial.