119 P.3d 711 (2005)
Donald E. PHILLIPS, Appellant,
v.
The STATE of Nevada, Respondent.
No. 42177.
Supreme Court of Nevada.
September 15, 2005.
*713 Philip J. Kohn, Public Defender, and Ralph E. Baker, Howard S. Brooks, and Craig D. Creel, Deputy Public Defenders, Clark County, for Appellant.
Brian Sandoval, Attorney General, Carson City; David J. Roger, District Attorney, and James Tufteland, Chief Deputy District Attorney, Clark County, for Respondent.
BEFORE THE COURT EN BANC.

OPINION
By the Court, BECKER, C.J.:
In this appeal, we consider the meaning of the terms "libel," "disgrace" and "secret" as used in Nevada's extortion statute, NRS 205.320. We conclude that "libel" refers to the publication of a false statement of fact, "disgrace" means to humiliate or cause loss of favor or standing, and "secret" means a fact that is unfavorable to the interest of a person and unknown to the public and that a person would wish to conceal.
Because the district court failed to properly instruct the jury about the elements of extortion, resulting in a verdict based on a legally insufficient theory of culpability, we conclude that the extortion convictions must be reversed and remanded for a new trial.
We further conclude that the district court erred in admitting prior bad acts evidence, but this error was harmless as to the remaining counts of aggravated stalking and preventing or dissuading a witness from testifying, and we therefore affirm those convictions.

FACTS
Between September 2000 and June 2001, Donald E. Phillips sent a number of letters to, and left several voicemail messages for, hotel developer Stephen Wynn, both at Wynn's residence and Wynn's offices. In the letters, Phillips claimed he was Wynn's half-brother and was entitled to half of the money Wynn allegedly inherited from their father. Several of the letters contained threats stating that if Wynn did not comply with his requests, Phillips would reveal their family's story, including accusations of crimes committed by Wynn or his father, to law enforcement authorities and the media.
When Phillips' demands were ignored, Phillips threatened to kill or injure Wynn if Wynn did not pay him money. Phillips also threatened Wynn's director of security, Scott Werwinski, claiming he would "get" Werwinski for going to the police and cooperating with the prosecuting authorities.
On August 1, 2001, Phillips was indicted on one count of aggravated stalking, eighteen counts of extortion, and one count of dissuading a witness from testifying or producing evidence. The extortion counts in the indictment contained the same language, alleging Phillips:
[D]irectly or indirectly threaten[ed] to accuse STEVEN [sic] WYNN with a crime and/or to injure STEVEN [sic] WYNN and/or to publish or connive at publishing any libel; and/or to expose or impute to STEVEN [sic] WYNN'S disgrace and/or a secret of STEVEN [sic] WYNN'S, with the intent to extort and/or gain money and/or United States currency, to wit: by defendant writing letters and/or correspondence demanding money from STEVEN [sic] WYNN while threatening to expose the said STEVEN [sic] WYNN to false claims of heritage and/or make false claims to law enforcement officers and/or the media.
Phillips filed a motion in the district court seeking a DNA comparison with Wynn to *714 determine whether Phillips' heritage claims (i.e., that Phillips was Wynn's half-brother) were false. Not wishing to subject Wynn to a DNA analysis, the State argued that extortion was a crime of threat and that the truth or falsity of the threat did not matter. Nevertheless, the State filed an amended indictment in which it altered the language charging extortion. The new language charged Phillips with extortion by, among other actions, "threatening to expose the said STEPHEN WYNN to alleged claims of common heritage."[1] As a result of the amended indictment, the district court denied Phillips' motion for a DNA analysis.
In its case-in-chief, the State moved to admit evidence of prior bad acts committed by Phillips; namely, a 1977 felony theft conviction, a 1978 armed robbery conviction, a 1983 attempted robbery conviction, a 1992 conviction for illegal possession of a concealed weapon, and a 1994 auto theft conviction. After a Petrocelli[2] hearing, the district court granted the State's motion in part, admitting evidence leading to the 1983 conviction for attempted robbery and the 1992 conviction for illegal possession of a concealed weapon.
At trial, three witnesses testified to events related to the 1983 attempted robbery conviction. A bank teller testified that a man (later identified as Phillips) pushed in beside a customer, shoved a bag at her, and ordered her to fill it. Phillips had his hand inside his coat, implying that he had a gun. When the teller informed Phillips that the police would be arriving in about two minutes, Phillips turned and left. Other witnesses testified as to how Phillips was identified as the suspect and his conviction.
With respect to the 1992 possession of a concealed weapon conviction, a bar patron testified that Phillips approached him and demanded that he buy Phillips a beer. When the witness refused, Phillips reached into his pocket, pulled out a bullet, and placed it in front of the witness and said that it had the witness' name on it. Phillips also pulled back his coat, revealing a shoulder holster with a pistol, and threatened to "blow [the witness'] head off" if he said anything. A police inspector testified to arresting Phillips and retrieving a .357 caliber handgun from him, loaded with six rounds of .38 special ammunition. The inspector also testified that a search produced eighteen more rounds of ammunition, a folding knife with a three-and-a-half- to four-inch blade, a hunting knife with a four- to five-inch blade, and a Swiss Army knife.
The State also called two of Phillips' relatives to testify about various threats he made to them if they did not pay him money.
Letters Phillips sent to Wynn between September 6, 2000, and the end of June 2001, were also admitted into evidence. The first batch of letters was postmarked in Oregon and dated from September to November 2000. In these letters, Phillips asserted that he and Wynn shared a biological father who had killed Wynn's mother and impregnated another woman with Phillips. This father allegedly left an inheritance to both Wynn and Phillips, which Phillips was attempting to claim. Phillips also requested that Wynn send him various sums of money ranging from twenty-five to fifty thousand dollars. Phillips stated that he would expose everything about their family if Wynn did not do the right thing. One letter indicated that Phillips was coming to Las Vegas and demanded that Wynn provide Phillips with rooms at the Bellagio hotel.
A second batch of letters was dated between December 2000 and March 28, 2001. One was postmarked in San Francisco, a second contained no postmark, and a third was postmarked in Las Vegas. These letters contained similar allegations as the first group and also accused Wynn of being affiliated with the Mafia. Phillips demanded money and threatened to go to the media and *715 the Federal Bureau of Investigation (FBI) to expose Wynn's alleged background and crimes if Wynn did not pay.
Phillips sent a third batch of letters. In one letter, Phillips addressed Werwinski, stating "I might die in prison, but I will get you." Phillips also alleged that Wynn had committed various violent crimes and continued to request money in return for Phillips' silence.
Werwinski testified that he received the letters and listened to various voicemail messages as part of the screening process used to review Wynn's mail and communications. Werwinski stated that he investigated Phillips to determine what level of threat Phillips might represent to the Wynn family. When the letters began to be postmarked from Las Vegas and a letter with no postmark was received, Werwinski increased his activities as the absence of a postmark suggested that this letter had been hand-delivered to Wynn's residence.
Werwinski wrote to Phillips' Las Vegas post office box instructing Phillips that all future contact should be made only through Werwinski. Werwinski stated that he believed Phillips was an absolute threat to the Wynns.
Evidence was also presented that a person identifying himself as either Donald Phillips or Don Vici[3] left two voicemail messages on Werwinski's recorder at Wynn Resorts. The messages contained a threat to kill Wynn. Werwinski informed Wynn and the police of the voicemail messages.
Wynn testified that he had never met Phillips, was not related to him, and denied his allegations. A Las Vegas police detective and an FBI agent testified that they could find no substantiation for Phillips' allegations.
Phillips presented no evidence in his defense. His theory, based upon cross-examination of the State's witnesses, was that he really did believe he was Wynn's half-brother and that he did not intend to threaten Wynn, only to get what was allegedly rightfully his from their alleged joint father's estate.
The jury returned a general verdict, finding Phillips guilty of one count of aggravated stalking, twelve counts of extortion, and one count of preventing or dissuading a witness from testifying or producing evidence. The jury acquitted Phillips on the remaining extortion counts. Phillips was adjudicated as a habitual criminal and sentenced to a term of life in prison with the possibility of parole after ten years on each count. The sentences on the one count of aggravated stalking and six of the extortion counts were to run consecutively. The sentences on the remaining six counts of extortion and the one count of preventing or dissuading a witness from testifying or producing evidence were to run concurrently.

DISCUSSION
Phillips raises two primary arguments on appeal: (1) a claim of common heritage does not constitute extortion under any theory of culpability enumerated in Nevada's extortion statute, and (2) the district court erred in admitting the testimony regarding his prior convictions.[4]

Extortion
Phillips asserts that the Nevada extortion statute does not impose criminal liability for demanding money based upon a claim of common heritage with another person. Phillips argues that if this were true, then every heir would be committing extortion by virtue of demanding a share of an estate based upon common heritage. Phillips contends that a claim of common heritage is not criminally actionable.
Because the jury entered only a general finding of guilt on the extortion charges, Phillips argues that it is impossible to discern which theory of extortion the jury used to convict him and that they therefore could have convicted him on the legally insufficient *716 theory of claiming a common heritage. Phillips asserts that the jury's general extortion verdicts must be set aside.
The State argues that threatening to expose Wynn to "alleged claims of common heritage" falls within the libel, disgrace or secret provisions of the statute and that there is no possibility Phillips was convicted of extortion based upon legally insufficient acts.
If several theories of criminal liability are presented to the jury and one is legally insufficient or unconstitutional, a general verdict cannot stand regardless of whether the other theories are legally sufficient and factually supported.[5] Conversely, if the theories are all legally sufficient, a general verdict can stand even if sufficient evidence supports only one of the theories.[6] "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law  whether, for example, the action in question ... fails to come within the statutory definition of the crime."[7] Thus, we must ascertain whether a claim of common heritage, standing alone, constitutes a crime under Nevada's extortion statute. If such a claim falls within one of the enumerated methods for committing extortion, then a general verdict form is sufficient. If it does not, then lack of a special verdict mandates reversal of the extortion convictions.
NRS 205.320 defines extortion. A person is guilty of extortion if, with the intent to gain something, he directly or indirectly threatens:
1. To accuse any person of a crime;
2. To injure a person or property;
3. To publish or connive at publishing any libel;
4. To expose or impute to any person any deformity or disgrace; or
5. To expose any secret ....[8]
Claiming to be an individual's half-brother is not an accusation of a crime or an injury to a person or property. Nor does it expose or impute to a person any deformity. To constitute a factual basis for extortion, such a claim must therefore involve libel, disgrace or a secret.
The extortion statute does not contain a definition of "libel." However, criminal libel is defined in NRS 200.510,[9] which states:
1. A libel is a malicious defamation, expressed by printing, writing, signs, pictures or the like, tending ... to impeach the honesty, integrity, virtue, or reputation, or to publish the natural defects of a living person ... and thereby to expose them to public hatred, contempt or ridicule.
....
3. In all prosecutions for libel the truth may be given in evidence to the jury, and, if it shall appear to the jury that the matter charged as libelous is true and was published for good motive and for justifiable ends, the party shall be acquitted, and the jury shall have the right to determine the law and the fact.
No definition is given for "defamation"; however, in the civil context, we have defined defamation as "a publication of a false statement of fact."[10] NRS 200.510 similarly implies *717 that libel must be false as truth may serve as the basis, in part, for an acquittal.
The State argues that for purposes of extortion, a statement does not have to be false to be libelous. However, the cases cited by the State for this proposition involve statutes distinguishable from Nevada's extortion statute. The statutes in question did not contain a libel provision and the true statements fell under other categories of the statutes.[11]
We conclude that a statement must be false to constitute libel under the extortion statute. Thus, a demand for money to refrain from publishing a true claim of common heritage does not constitute extortion by libel. We now turn to whether a claim of common heritage would meet some other theory of extortion under the statute.
Revealing or falsely claiming that you are an individual's illegitimate half-brother may fit within the statute's exposure to disgrace provision. A true claim of common heritage might also be a "secret" under the statute. Neither term is defined in Nevada's criminal statutes.
A dictionary defines "disgrace" as "to humiliate" or "to cause to lose favor or standing."[12] California, which has an extortion statute similar to Nevada's, has defined "secret" to mean:
[T]he thing held secret must be unknown to the general public, or to some particular part thereof which might be interested in obtaining knowledge of the secret; the secret must concern some matter of fact, relating to things past, present, or future; the secret must affect the threatened person in some way so far unfavorable to the reputation, or to some other interest of the threatened person, that threatened exposure thereof would be likely to induce him through fear to pay out money or property for the purpose of avoiding the exposure.[13]
Although the State argued that the truth or falsity of Phillips' claim of common heritage with Wynn was irrelevant, the jury was not instructed on why or how a true claim would violate the statute. The State presented evidence that the claim was false, but it never made the distinction between a false claim under the libel or disgrace provisions of the statute and a true claim under the disgrace or secret provisions. Thus, the jury could have convicted Phillips on the legally insufficient theory that a true claim constituted libel. In addition, the jury might have concluded that making a true claim constituted a crime without ever finding that its exposure would subject Wynn to disgrace or that the claim was an unfavorable secret likely to induce Wynn to pay to prevent its disclosure.[14]
We conclude that the district court's failure to properly instruct the jury on the elements of libel, disgrace and secret under the statute created a situation where the jury was permitted to consider a legally insufficient theory of extortion in its deliberations. Because the general verdict form does not specify which theory of extortion was used to convict Phillips, we reverse the extortion convictions per Yates v. United States,[15]United States v. Garcia,[16] and Griffin v. United States.[17]

Evidence of prior bad acts
Phillips contends that the district court erred in admitting evidence surrounding his *718 prior convictions because they were irrelevant, prejudicial, and too remote in time. The State argues that the evidence was admissible as proof of Phillips' intent, a common scheme or plan, and absence of mistake or accident, and that the probative value of the evidence was not outweighed by its prejudicial effect.
NRS 48.045(2) states that evidence of other crimes "is not admissible to prove the character of a person in order to show that he acted in conformity therewith," but it may be admissible as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In determining whether to admit such evidence, the trial court must conduct a hearing on the matter outside the presence of the jury and on the record.[18] Evidence of prior bad acts is only admissible when: (1) the incident is relevant to the crime charged, (2) the act is proven by clear and convincing evidence, and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.[19] The admissibility of prior bad acts evidence under NRS 48.045 is within the discretion of the trial court and its decision will not be disturbed on appeal unless it is manifestly wrong.[20]
Evidence admitted under the "common scheme or plan" exception must relate to the scheme or plan surrounding the defendant's commission of the charged crime.[21] Evidence admitted under the "absence of mistake" exception must tend to show the defendant's knowledge of a fact material to the crime charged.[22] Finally, "events remote in time from the charged incident have less relevance in proving later intent."[23]
Phillips was charged with extortion, aggravated stalking,[24] and preventing or dissuading a witness from testifying or producing evidence.[25] Evidence of the circumstances leading to Phillips' 1983 and 1992 convictions does not tend to prove a common scheme or plan to extort, stalk, or dissuade anyone from testifying in 2000 and 2001. Nor are the convictions relevant to mistake or accident. They do tend, however, to rebut Phillips' claim that he did not intend to extort money from Wynn but was only trying to claim what he honestly thought was his due as Wynn's half-brother.
Even if the convictions and testimony had probative value, Phillips argues that their prejudicial effect outweighed any probative value. Phillips contends that the remoteness in time of the convictions lessens their probative value and that the descriptions of the weapons used in the prior incidents *719 greatly enhanced their prejudicial effect. We agree.
The victims' testimony relating to those events, combined with the law enforcement testimony, particularly the evidence relating to the weapons seized from Phillips, portrayed Phillips as a violent individual. It was relevant to demonstrate that Phillips intended to extort money from Wynn, not claim an alleged inheritance. However, the events took place between nine and seventeen years before Phillips began his communications to Wynn and involved theft, not extortion. We conclude that the danger of unfair prejudice from the evidence substantially outweighed its probative value and that the district court manifestly abused its discretion in admitting the evidence.
Although the evidence relating to the attempted robbery and possession of a concealed weapon charges should not have been admitted, we conclude any error was harmless. Overwhelming evidence, including Phillips' postmarked and hand-delivered letters, move to Las Vegas, voice messages, threats to Werwinski, and threats to Wynn support his convictions. Thus, while we reverse the extortion convictions, we affirm the convictions for aggravated stalking and dissuading a witness.

CONCLUSION
We conclude that, in the absence of a special verdict form and jury instructions on the terms of "libel," "disgrace" and "secret," Phillips' extortion convictions could be based on a legally insufficient theory of law. We therefore reverse the extortion convictions and remand those counts for a new trial consistent with this opinion. Furthermore, the district court improperly admitted prior bad acts evidence; however, this error is harmless in light of the overwhelming evidence admitted at trial. Accordingly, we affirm Phillips' convictions on the counts of aggravated stalking and dissuading a witness from testifying or producing evidence.
GIBBONS, DOUGLAS and PARRAGUIRRE, JJ., concur.
MAUPIN, J., with whom HARDESTY, J., agrees, concurring:
I concur in the result reached by the majority. I write separately to point out an additional error in the admission of evidence concerning Phillips' 1983 and 1992 convictions, and the State's arguments thereon.
The prosecution clearly overplayed its hand in its closing remarks to the jury. As noted by Justice Rose, the prosecutor argued that this case involved the "same game, different victim" in referring to the prior convictions. This argument improperly treated the prior misconduct as character evidence, not for the stated other purposes under NRS 48.045(2).[1] Going further, the State's justification for admission of the prior bad act evidence strains credulityconduct leading to convictions years before was not part of a common scheme to extort and stalk the victims in this case.
While I agree that the admission of the evidence and the arguments do not compel reversal, I want to stress that there was no excuse for making arguments that endangered an otherwise strong case.
HARDESTY, J., concurs.
ROSE, J., concurring in part and dissenting in part:
I concur in the reversal of the extortion convictions for the reason stated, but I would also reverse the aggravated stalking charges and dissuading a witness from testifying because I do not believe the prior bad act evidence that was improperly admitted was harmless beyond a reasonable doubt.
The State's first five witnesses testified about two prior incidents that resulted in convictions against Mr. Phillips. The first was a 1982 incident where Phillips approached *720 a bank teller, shoved a bag at her, and told her to fill it up. Phillips had his hand in his coat, implying that he had a gun. She asked loudly if this was a robbery and Phillips left. He was arrested jogging away from the bank and apparently intoxicated. A gun was never found. The second conviction was for the possession of a concealed weapon in 1991. Phillips approached a patron at a bar in San Francisco and demanded that he buy him a beer. Phillips then reached into his pocket, pulled out a bullet, and placed it in front of the patron, stating it had the stranger's name on it. Phillips pulled his coat back and revealed a pistol in a shoulder holster. Phillips then scooped up the change from the bar, told the man that if he said anything, he'd blow his head off, and ran. Phillips was arrested and found in possession of a loaded revolver. The man at the bar testified that Phillips was "threatening, intimidating, and scary."
After the testimony about these two incidents, the jury could not help but have a vivid picture of Phillips as a crazed, threatening, dangerous man who carries deadly weapons. This is exactly the picture the prosecutor wanted the jury to have before she began presenting witnesses about the charges against Phillips.
Early in her final argument, the prosecutor reminded the jury about these two prior incidents.
He's threatened the bank teller before for money. When he realizes she says something to the police, he turns and he walks out of there because he knows the police are coming....
He has a prior conviction for walking in and showing a .357 Magnum and saying I'm going to blow your head off to which he went to prison. This defendant knows what it means to say I'm going to kill him.
The prosecutor then called Phillips a slick scam artist and a manipulative con man and stated: "same game, different victim." The prosecution certainly did not think the evidence of these two prior bad acts was inconsequential. Further, the argument "same game, different victim" improperly treats the bad acts as character evidence, not for the stated other purpose under NRS 48.045(2).
In Tavares v. State, we explained:
We have often held that the use of uncharged bad act evidence to convict a defendant is heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges. The principal concern with admitting such acts is that the jury will be unduly influenced by the evidence, and thus convict the accused because it believes the accused is a bad person.[1]
When we make a rule of law, we have the corresponding obligation to enforce it. Because I believe this prior bad act evidence had a substantial impact on the jury, I cannot conclude that its presentation to the jury was harmless beyond a reasonable doubt.[2] Therefore, I would reverse and remand all convictions for a new trial.
NOTES
[1] The State subsequently filed additional amended indictments, however, the charging language of the extortion counts remained the same, except to correct the misspelling of Wynn's first name.
[2] Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), modified in part on other grounds by Sonner v. State, 112 Nev. 1328, 1333-34, 930 P.2d 707, 711-12 (1996), and superseded by statute on other grounds as stated in Thomas v. State, 120 Nev. 37, 45, 83 P.3d 818, 823 (2004).
[3] At times, Phillips used this name to sign his letters to Wynn.
[4] Phillips also asserts that the amended indictments improperly charged him with a new or additional offense not considered by the grand jury and that he was substantially prejudiced by the amendments. We have considered this issue and find it to be without merit.
[5] Yates v. United States, 354 U.S. 298, 311-12, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); see also U.S. v. Garcia, 992 F.2d 409, 415-16 (2d Cir.1993).
[6] Griffin v. United States, 502 U.S. 46, 56-57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); Turner v. United States, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged.").
[7] Griffin, 502 U.S. at 59, 112 S.Ct. 466 (emphasis added).
[8] NRS 205.320.
[9] NRS 200.510 is found in provisions of the statutes relating to publishing libel (NRS 200.550) or threatening to publish libel (NRS 200.560).
[10] Pegasus v. Reno Newspapers, Inc., 118 Nev. 706, 714, 57 P.3d 82, 87 (2002).
[11] See United States v. Von der Linden, 561 F.2d 1340, 1341 (9th Cir.1977) (appellant charged with threatening to injure the property and reputation of another); People v. Goldstein, 84 Cal.App.2d 581, 191 P.2d 102, 106-07 (1948) (appellant charged with threatening to accuse another of a crime); State v. Workman, 14 Ohio App.3d 385, 471 N.E.2d 853, 860-61 (1984) (appellant charged with threatening to expose any matter tending to subject another to hatred, contempt, or ridicule, or to damage his personal or business repute, or to impair his credit); Wood v. Com., 8 Va.App. 560, 382 S.E.2d 306, 307-08 (1989) (appellant charged with threatening to injure the character of another).
[12] Webster's Collegiate Dictionary 332 (10th ed.1993).
[13] People v. Lavine, 115 Cal.App. 289, 1 P.2d 496, 499 (1931).
[14] Indeed, no evidence was ever presented that the claim was true, only that Phillips may have believed it to be true.
[15] 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356.
[16] 992 F.2d 409.
[17] 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371.
[18] See Petrocelli, 101 Nev. at 51-52, 692 P.2d at 507-08.
[19] Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).
[20] Mortensen v. State, 115 Nev. 273, 280, 986 P.2d 1105, 1110 (1999).
[21] Cirillo v. State, 96 Nev. 489, 492, 611 P.2d 1093, 1095 (1980); see also Brinkley v. State, 101 Nev. 676, 679-80, 708 P.2d 1026, 1028 (1985) ("The offense must tend to establish a preconceived plan which resulted in commission of the charged crime.").
[22] Cirillo, 96 Nev. at 492, 611 P.2d at 1095.
[23] Walker v. State, 116 Nev. 442, 447, 997 P.2d 803, 806-07 (2000) (concluding that events which were six and ten years old were clearly remote in time and less relevant to defendant's intent at time of incident).
[24] NRS 200.575(1) defines stalking as willfully or maliciously engaging in a course of conduct that would cause, and actually does cause, a reasonable person to feel terrorized, frightened, intimidated or harassed. According to NRS 200.575(2), "[a] person who commits the crime of stalking and in conjunction therewith threatens the person with the intent to cause him to be placed in reasonable fear of death or substantial bodily harm commits the crime of aggravated stalking."
[25] NRS 199.230 defines the crime of preventing or dissuading a witness from testifying or producing evidence as:

A person who, by persuasion, force, threat, intimidation, deception or otherwise, and with the intent to obstruct the course of justice, prevents or attempts to prevent another person from appearing before any court, or person authorized to subpoena witnesses, as a witness in any action, investigation or other official proceeding, or causes or induces another person to absent himself from such a proceeding or evade the process which requires him to appear as a witness to testify or produce a record, document or other object ....
[1] NRS 48.045(2) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
[1] 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001) (footnote omitted).
[2] Hymon v. State, 121 Nev. ___, ___, 111 P.3d 1092, 1099 (2005).